(No. 11858.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN E. HARTENBOWER *et al.* Plaintiffs in Error.

*Opinion filed April 17, 1918—Rehearing denied June 6, 1918.*

1. CRIMINAL LAW—*evidence of voluntary bankruptcy proceedings are admissible on a trial of bankers for a violation of paragraph 25a of Criminal Code.* Where all the circumstances attending the institution of bankruptcy proceedings against partners in the banking business show that it was voluntary and was so treated by the Federal court, evidence of such proceedings is admissible on a trial of said bankers for a violation of paragraph 25a of the Criminal Code, as are also the books and papers of the defendants in the hands of the trustee in bankruptcy.

2. SAME—*value of assets of bankrupt bank may be shown in a prosecution for violation of paragraph 25a of Criminal Code.* Witnesses who are familiar with the books, papers and assets of the estate of partners in a bankrupt banking business may testify as to the actual value of the particular assets, of which they have special knowledge, on the trial of said bankers for a violation of paragraph 25a of the Criminal Code.

3. SAME—*special counsel employed by private interests may assist State's attorney in prosecution.* The court may permit special counsel employed by private interests to assist the State's attorney in the prosecution of a person accused of crime.

4. SAME—*appearance of special counsel to assist the State's attorney before grand jury will not necessarily invalidate indictment.* The appearance of special counsel to assist the State's attorney in the examination of witnesses before the grand jury is not ground for quashing the indictment as being an infringement upon the secrecy of the proceedings, where said counsel is not present during the deliberations and does not attempt to influence the jury.

5. SAME—*mere irregularities are not ground for sustaining motion in arrest of judgment.* No indictment will be quashed, or judgment set aside on motion in arrest of judgment, for mere matters of form in the indictment or for other irregularities in the proceedings which do not affect the merits of the offense charged.

6. SAME—*an indictment will not be quashed because of submission of incompetent evidence to grand jury.* An indictment will not be quashed because incompetent evidence was submitted to or incompetent witnesses called before the grand jury unless all of the evidence submitted or all of the witnesses who testified were clearly incompetent.

7. SAME—*the court has discretion to require the People to elect on which counts they will prosecute.* The matter of requiring the People to elect upon which counts they will rely for a prosecution rests largely in the sound discretion of the court and will not be reviewed except in a clear case of abuse.

CARTER, C. J., specially concurring.

WRIT OF ERROR to the Appellate Court for the Second District;—heard in that court on writ of error to the Circuit Court of LaSalle county; the Hon. S. C. STOUGH, Judge, presiding.

A. E. BUTTERS, HENRY M. KELLY, STEAD, WOODWARD & HIBBS, and RAY E. LANE, for plaintiffs in error.

EDWARD J. BRUNDAGE, Attorney General, GEORGE S. WILEY, State's Attorney, and EDWARD C. FITCH, (LEE O'NEIL BROWNE, of counsel,) for the People.

Mr. JUSTICE CRAIG delivered the opinion of the court:

Plaintiffs in error, John E. Hartenbower and George D. Hiltabrand, were indicted, tried and convicted in the circuit court of LaSalle county for a violation of paragraph 25a of the Criminal Code of this State. The indictment contained six counts. Each count charged that the plaintiffs in error were engaged in the private banking business at Tonica, LaSalle county, this State, under the name and style of "Tonica Exchange Bank," and on November 14, 1913, as such bankers, and with knowledge of their insolvency, received a deposit of $64 from Bert Phelps, who was then and there not indebted to said bank, by reason of which the deposit became lost to him. The first count charges that the plaintiffs in error received the deposit and feloniously and fraudulently converted the money to their own use. The second count charges that they entered into a conspiracy to embezzle a large amount of money, and that pursuant to such conspiracy they received the deposit and

fraudulently and feloniously converted it to their own use. The third count charges a conspiracy to embezzle a large amount of money, and the receipt of the money of Phelps, as bailee, pursuant to such conspiracy, with intent to cheat and defraud him, contrary to the statute. The fourth count charges them with larceny of the money as bailee and a conversion of the same to their own use. The fifth and sixth counts charge that they obtained the money by means and by use of the confidence game. A motion was made to quash the indictment, which was overruled. A plea of not guilty was then entered. When plaintiffs in error were placed upon trial they made their motion for a rule on the People to elect on which counts they would proceed. The motion was denied but was renewed later, and the People elected to proceed under the first two counts, so that all but those counts are eliminated from the case. The jury returned a verdict finding plaintiffs in error guilty in manner and form as charged in the indictment, and imposed a fine of $128 upon each and fixed their punishment at three years in the penitentiary. Motions for a new trial and in arrest of judgment were made and respectively overruled and judgment was entered on the verdict. The court assessed a fine against each plaintiff in error of $128 and sentenced each to the penitentiary for the period of three years. A writ of error was sued out of the Appellate Court for the Second District, and on a review of the record in that court the judgment of the lower court was affirmed. A further writ of error has been sued out of this court to review the judgment of the Appellate Court.

There is no substantial controversy as to most of the essential facts in the case. On and prior to November 14, 1913, plaintiffs in error were engaged in the private banking business in the village of Tonica under the name of "Tonica Exchange Bank." The bank was owned by them jointly. They were raised in that immediate neighborhood and for a number of years had conducted the only bank

located at that place. The bank closed its doors and ceased doing business on the evening of November 14, 1913, and was never thereafter opened for business. George D. Hiltabrand resided in Tonica and had active charge of the bank, being assisted by his brother, B. F. Hiltabrand, and Wilfred J. Ebner, who acted as assistant cashier and book-keeper. Ebner had acted in that capacity for about twelve years. For several years before the bank closed John E. Hartenbower resided in Chicago, where he conducted a real estate business. He kept himself advised as to the condition of the bank by visiting Tonica three or four times a month and spending from one to two days in the bank at a time. He also looked after their credit with the Continental and Commercial National Bank of Chicago, which was their correspondent at that place. Credit was maintained with that institution by plaintiffs in error by depositing with it notes of their patrons as collateral security for advances made to them. This had been their practice for the last two years before the bank closed. There is correspondence between plaintiffs in error which shows that as early as 1909 they were in a strained financial condition, and that in April, 1913, they were compelled to re-discount their paper to "the limit" in order to keep their institution going. Hartenbower was in Tonica on November 3 and 8, 1913, and his handwriting appears in the books under the date of November 12, 1913. During the day of November 14 Bert Phelps made a deposit of $64 over and above any indebtedness he owed the bank, and other deposits were made by other persons aggregating $5877.50. On that evening Hartenbower, Hiltabrand and his wife, Ebner and an attorney met in Chicago and their financial condition was discussed. In the conversation at that time Hartenbower appears to have said that they were broke and had arranged to go into bankruptcy. They then took a late night train out of Chicago for LaSalle. Their attorney met them at Ottawa and the party went on to LaSalle. A con-

ference was had at LaSalle, and such arrangements were made that between then and morning plaintiffs in error procured three of their friends, Kreider, Bassett and Matern, to meet them at their attorney's office in Ottawa in the morning, where an involuntary petition in bankruptcy was prepared under plaintiffs in error's direction. On November 17, 1913, a petition in bankruptcy was filed, signed by these parties, and on January 15 following, plaintiffs in error, both individually and as co-partners, were adjudicated bankrupts. There is no substantial dispute as to their liabilities. In their schedule filed in the bankruptcy proceedings they placed their liabilities at $514,194.50 and their assets at $551,648.55. Most of the assets scheduled have proven practically worthless. Most all the assets had been disposed of at the time of the trial, and only a small per cent,—about six and one-half per cent,—had been realized for the creditors. In many instances scheduled assets totaling thousands of dollars have proven practically worthless, so that there cannot be the least doubt but that plaintiffs in error were hopelessly insolvent and knew of their insolvency long before they induced their friends to procure a formal adjudication of such fact.

It is insisted that there is no satisfactory proof of insolvency and knowledge of such fact on the part of plaintiffs in error. The argument in support of this proposition is addressed not so much to the question of the actual solvency of the plaintiffs in error as it is to the competency of the proof by which their insolvency and knowledge of such insolvency was established. For the purpose of showing the insolvency of plaintiffs in error and their knowledge thereof defendant in error introduced in evidence the circumstances attending the institution of the bankruptcy proceedings, the judgment of the Federal court adjudging the plaintiffs in error bankrupts, the schedules of the plaintiffs in error filed in such proceedings, proof of what the property scheduled (such as was salable) had sold for at the

various sales conducted by the trustee in bankruptcy, and that many of the notes and accounts scheduled as good were wholly uncollectible. The defendant in error further proved by the testimony of Ebner, the assistant cashier, that more than a year before the bank closed he spoke to plaintiff in error Hartenbower about the condition of the bank on account of being short in Chicago and not having money to take care of drafts. He also testified that their books did not show right for probably a year, and that as far back as February 6, 1909, the liabilities exceeded the good assets by more than $150,000, and that there was nothing to prevent plaintiffs in error from knowing such fact; that at that time B. D. Hurd was owing over $80,000 which he knew was not good; that the J. C. Lambert Company account of over $38,000 was not good; that the G. W. Greiner account of nearly $30,000 was not good; that the Lowell Pottery Company account of nearly $70,000 was worth only a fraction of that amount, and that H. F. Hartenbower, who owed $11,000, was not worth a dollar; that he knew the bank was carrying all this dead stuff as assets, and that under those circumstances the bank could not be solvent; that the only hope for the bank for a long while before it closed would be some outside interest that he didn't know of. He further testified that during the last two years the paper of its customers was deposited with the Continental and Commercial National Bank of Chicago as security, and when a customer came in to pay his note or the interest thereon plaintiffs in error would have to send to Chicago for it, and that they went along in that way from day to day, doing business on the strength of the paper of their customers. His testimony in this respect is fully corroborated by a letter from Hiltabrand to Hartenbower under date of April 7, 1913. He further testified that during the last twelve years of the bank's existence there was never an accounting or division between the partners, a dividend declared or even a balancing of the books

and a trial balance struck, and that during all of that time not a single note or loan was charged up as bad or worthless but all were carried along as good assets; that on the evening the bank closed, at the meeting in Chicago, Hartenbower said to Hiltabrand and the others present: "Drafts have been protested by the Continental and Commercial National Bank and we cannot get any money and we are broke; we have arranged to go into bankruptcy; it is all my fault and I will take the blame." Defendant in error also proved by Austin Hiltabrand that he had a talk in the Tonica bank building with plaintiff in error Hiltabrand about eight days after the bank closed, in which he said: "Aus, [that is what he called me,] I have known this for six years; then is when I ought to have quit; I ought to have got out of there then;" and that he had known for six years that the bank was going to break. None of this testimony as to statements made by the plaintiffs in error and conditions in their bank is either disputed or denied. So far as this record shows it stands admitted. It further appears from their letters written during the years 1911, 1912 and 1913 that plaintiffs in error were frequently hard pressed for cash, and from a letter written by Hiltabrand to Hartenbower on April 7, 1913, that they were at that time so hard pressed that they were compelled to discount paper of their clients to "the limit" in order to keep the institution going. In this letter, among other things, he said: "I am enclosing such col. [meaning collateral] as we had. It is needless to say how much we need, but we will certainly have to re-disc't the limit for the am't of col. we have. I only hope you will be able to raise something outside from some source."

Plaintiffs in error insist that it was error to admit in evidence the proceedings in the bankruptcy court for the reason such proceedings were involuntary, as plaintiffs in error filed their answers denying their insolvency. No trial was had on this issue in the Federal court. The hearing appears to have been *ex parte,* and the order entered on

January 15, 1914, is one of voluntary bankruptcy. The order recites that the petition asking that John E. Hartenbower and George D. Hiltabrand, individually and as co-partners, trading under the firm name and style of Tonica Exchange Bank, be adjudicated bankrupt within the true intent and meaning of the act of Congress relating to bankruptcy, having been heard and duly considered, said Hartenbower and Hiltabrand, individually and as co-partners, are declared and adjudicated bankrupt accordingly. No attempt was made to impeach, explain or contradict this order. The evidence further shows beyond a shadow of doubt that the proceedings, although involuntary in form, were voluntary in fact and instituted and carried on at the instance of plaintiffs in error. No one of the petitioners in the bankruptcy proceedings had any thought of instituting such proceedings until called upon and urged to do so by plaintiffs in error. Up to that time the petitioners do not appear to have questioned the solvency of plaintiffs in error. The idea of going into bankruptcy apparently originated with plaintiffs in error in Chicago on the night of November 14, 1913, pursuant to which they made a night trip to LaSalle to see their friends and induce them to act as petitioners in such proceedings. All the circumstances attending the institution of the bankruptcy proceedings show that they were, in fact, wholly voluntary and were so treated in the United States district court.

Plaintiffs in error further insist it was error to admit in evidence the books, papers, etc., of plaintiffs in error in the hands of the trustee in bankruptcy. This question, as well as the other question above raised, was considered in *People v. Munday,* 280 Ill. 32, and such evidence was there held to be admissible. What is there said is conclusive of the question here.

It is further insisted it was error to permit proof to be made of the value of the assets from what they sold for in the regular course of the bankruptcy proceedings by those

who conducted such proceedings, as those persons were not shown to have the knowledge as to the value of such property necessary to qualify them as witnesses. It was shown by certified copies of the bankruptcy proceedings of B. D. Hurd, who owed plaintiffs in error upwards of $80,000, that he became a voluntary bankrupt March 10, 1913, and that nothing was realized from his estate; by the trustee in bankruptcy of G. W. Greiner, a relative of one of the plaintiffs in error, who owed upwards of $30,000, that his estate would not pay to exceed ten per cent; and by the attorneys for the trustee for plaintiffs in error and the referee in bankruptcy that many of the other assets of the bank, such as the indebtedness of plaintiff in error Hartenbower of over $112,000, D. H. Craig of $15,000, the J. C. Lambert Company of upwards of $48,000, and the Lowell Pottery Company of upwards of $68,000, were either entirely worthless or practically so. In fact, of scheduled assets totaling $551,648.55 more than $500,000 were practically worthless, and out of the vast amount of alleged "good assets" but about $42,751.39 were salable or had a market value. The property is shown to have been sold in the regular course of such bankruptcy proceedings and at a comparatively short time after plaintiffs in error were adjudged bankrupts, and it is inconceivable that marketable assets having anything like their face value could have shrunk that much in such a comparatively short time. As a matter of fact, a large portion of the assets was shown to have no market value and to be unsalable. Under the circumstances we think it was competent for the jury to have this evidence, in connection with the other evidence in the record, in determining the value of the property. This evidence was also proper for the purpose of showing that the deposit of Phelps was lost to him.

As to the competency of the testimony of the attorneys for the receiver and the referee in bankruptcy, they were each connected with the proper administration of the bank-

rupt estate, and by reason of such connection with the estate and from the books and papers of the bank they possessed special knowledge as to the contents of such books and papers and of the nature and condition of the assets of the bankrupt estate. The same may also be said of the testimony of the expert accountant, LeClear, who had made an extensive examination of the books of plaintiffs in error and testified as to summaries made by him from such books. In many instances the books showed that the interest was not collected from many of the heaviest borrowers as their indebtedness matured but was added to new notes given from time to time for such indebtedness, and that this practice went on from year to year, apparently without any effort on the part of plaintiffs in error to realize on such accounts, which they must have known were fully as worthless as they subsequently turned out to be. Where witnesses are familiar with the books, papers and assets of the estate and are possessed of special knowledge from such examination of the books, papers and assets, they are competent witnesses as to such matters. (*Chicago and Western Indiana Railroad Co.* v. *Heidenreich,* 254 Ill. 231; *People* v. *Gerold,* 265 id. 448; *People* v. *Munday, supra.*) There was no error in the admission of this evidence.

It is further insisted it was error to permit special counsel to assist the State's attorney in the prosecution of plaintiffs in error, and also error to overrule the motion of plaintiffs in error to quash the indictment, for the reason it appears that said special counsel, Lee O'Neil Browne, appeared before the grand jury in connection with the State's attorney and assisted him in the examination of witnesses before that body in relation to the matters on which the indictment against them was returned.

As to the first contention, the power of the court to permit special counsel employed by private interests to assist the State's attorney in the prosecution of the accused has frequently been passed upon by this court and in each in-

stance the right of the court to do so has been sustained. (*Hayner* v. *People,* 213 Ill. 142; *People* v. *Blevins,* 251 id. 381; *People* v. *Gray,* 251 id. 431; *People* v. *Donaldson,* 255 id. 19; *People* v. *Strosnider,* 264 id. 434; *People* v. *Gerold, supra.*)    In *Hayner* v. *People, supra,* it was held the act of May 15, 1903, (Hurd's Stat. 1917, chap. 14, sec. 6a,) which provides that the State's attorney shall not receive any fee or reward for any service within his official duties, and shall not be retained or employed, except for the public, in any civil case depending on the same state of facts on which a criminal prosecution depends, did not abridge this power of the court. We find nothing in this case that takes it out of the general rule above announced.

As to the second proposition, that is the principal ground urged for reversal of the judgment. The evidence with respect to this matter shows that Browne was employed by the trustee in bankruptcy to represent him in the examination of witnesses at the creditors' meeting before the referee in bankruptcy, held for the purpose of examining the bankrupts and other witnesses with a view of discovering assets. In connection with this matter Browne made an examination of the books, papers, securities and assets of the bank and participated in the examination of plaintiffs in error and others before the referee in bankruptcy. In that way he became familiar with the matter of the various transactions out of which plaintiffs in error's insolvency arose, the extent of their liabilities and assets and matters of that character. After this hearing was concluded and Browne had been paid in full for his services by the trustee he was consulted by a number of creditors of the bank with a view of instituting criminal proceedings against the plaintiffs in error. Browne consulted with the State's attorney about the matter, and when the grand jury convened for the June term of the circuit court of LaSalle county he was requested by the State's attorney, and also by the foreman of the grand jury, to appear before that

body and assist in the examination of such witnesses as might appear before it in relation to such matter. Pursuant to such request Browne, in connection with the State's attorney and at his suggestion and under his direction, appeared before the grand jury and examined the witnesses who appeared before that body in connection with the charges preferred against plaintiffs in error. In this respect he acted as assistant to the State's attorney without being duly and regularly appointed to that position. It is not claimed that Browne was present in the grand jury room at any time when the grand jury were deliberating on the case or discussing any matters pertaining to it or when they voted to return indictments against plaintiffs in error, nor is it claimed that he in any way tried to influence that body in their deliberations or urged them to return indictments against plaintiffs in error, or that he did anything more than interrogate such witnesses as appeared before that body under the personal direction of the State's attorney. In fact, the evidence clearly refutes any other conclusion.

Notwithstanding the proof of the commission of the crime is clear and the guilt of the plaintiffs in error certain, it is insisted the judgment must be reversed because of the appearance of Browne before the grand jury. The cases mostly relied upon to sustain this contention are *People* v. *Arnold,* 248 Ill. 169; *Vires* v. *State,* 10 Okla. Crim. 28; *Latham* v. *United States,* 226 Fed. Rep. 420; *United States* v. *Heinze,* 177 id. 770; *United States* v. *Edgerton,* 80 id. 374; *State* v. *Salmon,* 216 Mo. 466; *Wilson* v. *State,* 70 Miss. 595. In the *Arnold case* we held it was not ground for quashing the indictment that the prosecutrix in an action for rape and her father and mother were permitted to appear before the grand jury at the same time. In the *Latham case* a clerk in the district attorney's office appeared before the grand jury and took shorthand notes of the testimony. The indictment was returned in a Federal court, and the practice in such matters is largely regulated by stat-

ute. The decision in that case is based largely on statutory grounds, and is neutralized by *Wilson* v. *United States,* 229 Fed. Rep. 344, where directly the opposite conclusion was reached on substantially the same state of facts. In the *Vires case* the statute of Oklahoma provided that the county attorney may appear before the grand jury for the purpose of giving information or advice and may interrogate any witness before them whenever he thinks it necessary, but that no other person shall be permitted to be present during their session except the members and the witnesses actually under examination. The decision in that case quashing the indictment because a special assistant county attorney appeared before the grand jury and performed the duties of the county attorney was based upon the provisions of such statute.

The above decisions, while they contain a very interesting and instructive discussion of the question under consideration, are not controlling here. In this State we have no statute prescribing who may appear before the grand jury and interrogate such witnesses as may appear before that body. The current of authority in other jurisdictions where no statutory regulations prevail, as well as the best reasoned cases, clearly supports the view that the appearance of an unauthorized person before the grand jury, where he is not present during their deliberations and does not attempt to influence their action, will not invalidate the proceedings unless prejudice is shown. In this connection see note to *Hartgraves* v. *State,* 33 L. R. A. (N. S.) 568; note to *Latham* v. *United States,* 1916D, L. R. A. 1118; *State* v. *Brewster,* 70 Vt. 341; *State* v. *Whiting,* 7 Ore. 386; *State* v. *Justus,* 11 id. 178; *Blevins* v. *State,* 68 Ala. 92; *McElray* v. *State,* 49 Tex. Crim. 604; *State* v. *Fertig,* 88 Iowa, 139. The only statute we have in this State bearing directly upon the proceedings of the grand jury is section 10 of division 11 of the Criminal Code. (Hurd's Stat. 1917, p. 1029.) It provides that no grand juror or officer of the

court shall disclose that an indictment is found or about to be found or how any grand juror voted or expressed his opinion, etc., and is designed to preserve the secrecy of proceedings before the grand jury. It is uniformly held that the appearance of an unauthorized person before such body will not invalidate the proceedings as an infringement upon their secrecy. *People* v. *Nall,* 242 Ill. 284; *State* v. *Tyler,* 122 Iowa, 125.

It has ever been the policy of this State that no indictment should be quashed or judgment set aside, on motion in arrest of judgment, for mere matters of form in the indictment or for other irregularities in the proceedings which do not affect the merits of the offense charged. Section 9 of division 11 of the Criminal Code provides: "All exceptions which go merely to the form of an indictment, shall be made before trial, and no motion in arrest of judgment, or writ of error, shall be sustained, for any matter not affecting the real merits of the offense charged in the indictment. No indictment shall be quashed for want of the words, 'with force and arms,' or of the occupation or place of residence of the accused, nor by reason of the disqualification of any grand juror." The language of this section is very broad, and the words "for any matter not affecting the real merits of the offense charged in the indictment" may well be held to apply to irregularities in the proceedings before the grand jury which do not go to the merits of the offense charged and are not shown to have operated to the prejudice of the accused. Thus, we held in *People* v. *Arnold, supra,* that the appearance of the father and mother with the prosecutrix before the grand jury on an indictment for rape would not avoid the indictment. In *People* v. *Nall, supra,* we held that the appearance of a special attorney for the State before the grand jury would not invalidate an indictment. In *People* v. *Bladek,* 259 Ill. 69, we held that an indictment would not be quashed where it appeared the wife of the accused was called before the

grand jury and compelled to testify against her husband where the indictment showed other witnesses were before the grand jury, although the practice of calling the wife was highly improper and would constitute reversible error if the indictment showed that it had been returned on her evidence, alone.    While the precise point involved in this case was not before the court in those cases, the matters involved in the decisions and the conclusions there reached clearly demonstrate that it is not the policy of this State that indictments shall be quashed or judgments set aside, on motion in arrest of judgment, for mere irregularities or informalities in the proceedings by which the charge was preferred, that do not go to the merits of the offense charged and operate to the prejudice of the accused.    If the submission of highly incompetent evidence to the grand jury by the State's attorney will not invalidate an indictment, the submission of competent evidence under the examination of a special attorney acting under the direction of the State's attorney ought not to do so.    The danger of prejudice to the rights of the accused is much more likely to occur in the former than in the latter case.    We have uniformly held that an indictment will not be quashed because incompetent evidence was submitted to or incompetent witnesses called before the grand jury, unless all of the evidence submitted or all of the witnesses who testified were clearly incompetent.    (*People* v. *Bladek, supra; People* v. *Duncan,* 261 Ill. 339.)    The courts in other States where this question has been raised have refused to avoid indictments on this ground.    Thus, in *State* v. *Justus, supra,* the court refused to set aside a judgment of conviction and quash the indictment because a person not authorized by law was present before the grand jury, at the request of the district attorney, and assisted in the examination of witnesses and in framing the indictment.    It was there said: "At most it is but an irregularity, but of that character which does not bring into question the qualifications of the

grand jurors or their fairness towards the accused. Nor is it claimed that any injustice or wrong was done to the prisoner by means of this alleged error at the trial. Upon authority it is clear the objection cannot prevail." The same may be said of this case. To the same effect is *Blevins* v. *State, supra,* where it was held that the appearance of an attorney before the grand jury at the request of the State's solicitor, without permission of the court, and who participated in the examination of the witnesses, did not avoid the indictment, it not appearing that he counseled the finding of a true bill against the accused or expressed an opinion favorable to its finding. Other cases are cited above which will sustain this view. Upon a review of the cases we are satisfied that both the better reason and weight of authorities support the conclusion we have reached and that the court did not err in refusing to quash the indictment.

What we have just said also disposes of the further contention that the indictment should have been quashed because it appears that a transcript of the testimony of the plaintiffs in error given at the creditors' hearing was before the grand jury. While the record fails to show that this testimony was read to the grand jury or in any manner considered by them, it would not invalidate the indictment if it had been, the indictment showing that other witnesses were before that body on whose testimony such an indictment might have been returned. *People* v. *Bladek, supra.*

It is also insisted that reference was made in the opening statement for the prosecution concerning matters which the evidence introduced failed to justify, and that the court erred in not requiring the People to elect upon which counts they would rely before the conclusion of the taking of evidence. As to the first point made the record does not bear out the contention, while as to the latter, it is one resting largely in the sound discretion of the court and will not be reviewed except in a clear case of abuse. *Schintz* v. *People,* 178 Ill. 320.

As to the other poirrts urged, they have been considered, but we do not deem them of sufficient importance to require a discussion. While there is some evidence in the record the competency of which is doubtful, it was of such a character that it could not have affected the result, and when the character of the defense interposed is taken account of and the difficulty attending the proving of many of the matters in issue is considered it is not surprising that some evidence of questionable competency should have been admitted. Scarcely a case of any importance is ever tried in which this does not occur.

No question is raised as to the instructions.

On a careful review of the record we are satisfied the case was fairly and impartially tried and the guilt of plaintiffs in error established beyond all reasonable doubt by the most clear and satisfactory evidence.

The judgment of the Appellate Court is right and will be affirmed.                    *Judgment affirmed.*

Mr. CHIEF JUSTICE CARTER, specially concurring:

I agree with the final conclusion of the opinion in this cause·but not with all that is said, and the way it is said, with reference to attorney Browne acting as attorney for the State before the grand jury. That body is organized for the purpose of protecting citizens against unfounded accusations. The theory of the organization of the grand jury is that it is the best method by which persons accused of public offenses may be brought to trial and yet not be put to the expense and notoriety of a public trial unless the accusation is based upon something more than a mere suspicion. The general rule is that no person shall be required to answer for any of the higher crimes unless a grand jury, consisting of not less than sixteen nor more than twenty-three men selected from the body of the district, shall declare, after careful deliberation under the sol-

emnity of an oath, that there is good reason for the accusation and trial. (2 Sawyer Cir. Ct. *667.) Neither the accused nor the accuser should be permitted to be represented personally by counsel before the grand jury. (*In re Gardiner,* 64 N. Y. Supp. 760.) There should not only be no improper influence in the grand jury room, but in the investigation before that body there should be no opportunity for such improper influence to be exercised. (*Lewis* v. *Commissioners,* 74 N. C. 194.) In some States it is held that the mere presence of a stenographer in the grand jury room for the purpose of taking shorthand notes, or the presence of a witness who is not testifying at the time while another witness is testifying, is reversible error. (*State* v. *Salmon,* 216 Mo. 466.) The State's attorney of the proper county in this State is the legal assistant of the grand jury, and he, or his representative properly selected according to law, is the only one who ought to appear in the grand jury room to assist in the work of that body. (Hurd's Stat. 1917, chap. 14, par. 5, p. 121.) Such an officer is acting in a *quasi* judicial capacity, representing public justice, and should stand indifferent as between the accused and any private interest. (*People* v. *Gerold,* 265 Ill. 448.) He may be present to give advice, to question the witnesses, to draw such bills as the jurors are prepared to find and to give such general instructions as to the law as occasion may require, but he must not attempt to influence or direct the actions of the grand jury in respect to their findings nor be present when they are deliberating on the evidence or when their vote is taken. (*Gitchell* v. *People,* 146 Ill. 175.) Except as authorized by law he should not delegate the functions or responsibilities of his office to any other person. *McGarrah* v. *State,* 10 Okla. Crim. 21.

In this State the number of assistants to the State's attorney must be determined by the county board, and then they can be legally appointed by the State's attorney. The county board of LaSalle county, where this indictment was

voted by the grand jury, had theretofore authorized the
State's attorney of that county to appoint one assistant.
This assistant had been appointed and was acting as such
at the time this indictment was voted. Apparently, how-
ever, such assistant had nothing to do with this investiga-
tion before the grand jury. If the State's attorney for
any reason needs special assistants other than those author-
ized to be appointed, under the statute, by the authority
of the county board, the court has the power to appoint a
special assistant. (*Lavin* v. *Cook County Comrs.* 245 Ill.
496.) Attorney Browne's appointment was neither au-
thorized by the county board, nor sanctioned, directly or
indirectly, by the trial court. He took no oath of office.
It appears that the foreman of the grand jury specially re-
quested that Browne be allowed to appear before that body
and assist in the investigation. It also appears that Browne
had been employed by some of the creditors of this bank,
prior to the grand jury investigation, to examine into the
civil liability of the bank and its officials, and by this private
employment had become familiar with the business of the
bank. Perhaps partly because of his knowledge thus ob-
tained, some of the creditors desired him to assist in the
criminal investigation and suggested to the State's attorney
his employment for that purpose. Before he accepted such
employment Browne consulted with State's attorney Wiley,
of LaSalle county, and, apparently with the sanction of the
State's attorney, took charge of such investigation before
the grand jury.

It is manifest from the record before us that Browne
practically controlled the entire investigation and took en-
tire charge of the presentation of the evidence before the
grand jury. Neither the foreman of the grand jury, nor
the grand jury itself, nor the trial judge, nor the State's
attorney, had any right to turn this investigation before
the grand jury over to the creditors of the insolvent bank.
While it is true that it is proper and legitimate for counsel

283 – 39

to be employed to assist the State's attorney in open court in the prosecution of a criminal charge and the accused can there be represented by counsel and everything is done in open court, yet even in the trial of a case in open court the State's attorney should control the prosecution. It seems to me highly improper for counsel employed by private parties to prosecute a case to go into a grand jury room, where the accused cannot be heard and has no one representing him. The investigation before the grand jury should be performed only by counsel who have been chosen, as required by law, to represent the public interests. (*Hartgraves* v. *State,* 5 Okla. Crim. 273; *Wilson* v. *State,* 70 Miss. 595.) To hold otherwise as a rule of law might subject innocent persons to vindictive persecution. No matter how honest and efficient the services of attorney Browne may have been, his full knowledge of the case did not justify his substitution for the regular public official in the investigation before the grand jury. *United States* v. *Rosenthal,* 121 Fed. Rep. 862.

As stated in the opinion, objections which go to the mere form of the indictment on a writ of error should not be sustained for any matter not affecting the real merits of the offense charged in the indictment. If there were the slightest doubt of the clear guilt of each of the plaintiffs in error in this case this judgment ought not to stand because of the error committed in permitting Browne to take control of the prosecution before the grand jury and on the trial of the case. The practice followed in the investigation of this case in permitting private counsel to control, in effect, the investigation before the grand jury is not consonant with justice or the principles of personal liberty and should be strongly condemned.