People of State of Illinois, Defendant in Error, v. Thomas Moretti, Lawrence Moretti, and Pasquale Moretti, Plaintiffs in Error.

### Gen. No. 45,927.

filed December 30, 1952. Released for publication January 28, 1953.

ALLAN R. BLOCH, and SIDNEY Z. TEPPER, both of Chicago, for plaintiffs in error; ODE L. RANKIN, of Chicago, of counsel.

HAROLD A. SMITH, Special State's Attorney, and RICHARD B. AUSTIN, Assistant Special State's Attorney, both of Chicago, for defendant in error.

MR. JUSTICE SCHWARTZ delivered the opinion of the court.

Defendants Thomas Moretti, Lawrence Moretti, and Pasquale Moretti were found guilty in the criminal court of Cook county on an indictment charging them with having conspired to obstruct justice. Thomas Moretti was sentenced to one year in the county jail and fined $2,000; Lawrence Moretti was fined $2,000, and Pasquale Moretti was fined $1,000.

This case is a by-product of one of those incredibly violent and tragic episodes that periodically afflict our county. Early in the morning of August 24, 1951 Arthur Gamino and Edward Salvi were killed and Leonard Monaco was wounded by Michael Moretti, a brother of defendants. Michael Moretti was a police officer of the City of Chicago and was assigned to duty out of the office of the State's Attorney of Cook county. The grand jury impaneled for the August 1951 term

heard the evidence and returned a no bill. During the same term a hearing was conducted before the Coroner of Cook county inquiring into the murders and shootings. On September 18, 1951 the State's Attorney of Cook county presented a petition to the Chief Justice of the criminal court, averring that new evidence had come to his attention; that he believed he was a prospective witness and might be called to give evidence, and he therefore prayed that the court appoint a special attorney to prosecute the causes, with the same power and authority as the State's Attorney would have. The Chief Justice thereupon appointed Harold A. Smith Special Attorney. Smith took the oath of office and appointed Richard B. Austin as his assistant.

On September 26, 1951 an order was entered directing that Smith present evidence relating to the homicides and shooting to the October Grand Jury. Evidence was accordingly presented and resulted in the return prior to October 18, 1951, of two indictments for murder against Michael Moretti. On that day, the Grand Jury still having under consideration the question of indictment as to the shooting of Leonard Monaco, Smith presented a petition to the Chief Justice, alleging that offers of bribes and threats of violence had been communicated to Monaco on behalf of members of Michael Moretti's family, for the purpose of inducing Monaco to change his testimony. The petition requested instruction from the court as to what course Smith should pursue. The court instructed Smith to present the evidence, prepare and present indictments as the Grand Jury should direct, and to prosecute the causes with the same power and authority as the State's Attorney would have. On October 31, 1951 the Grand Jury returned the conspiracy indictment which is the subject matter of this cause. Motion to quash was duly made and overruled, and the case

went to trial, resulting in the verdicts and judgments appealed from.

It is first argued that the charge was not proved beyond a reasonable doubt. The principal witness for the State was Georgia Pannos, a young woman friend of Monaco's. In brief summation, she testified that on the night of October 8, 1951 Thomas Moretti came to her home about 7:30 or 8:00 p. m.; that he told her he would pay Leonard Monaco $5,000 or would give him a 4-room apartment furnished if he, Monaco would "change his testimony"; that he also told her that Monaco's lawyer would tell him what to say. He told her of a previous offer he had made to Monaco. Monaco had earlier stated that Salvi did not have a gun and that he knew this definitely. Such testimony had an important bearing on the defense. At Thomas Moretti's suggestion, Miss Pannos accompanied him that evening to his mother's home where, in the presence of other members of the Moretti family and in the hearing of his brother Lawrence, the offer was repeated. From his mother's home they drove to the apartment of Emily Moretti, Michael Moretti's wife, where in the presence of Lawrence and Thomas, Miss Pannos was shown the furniture and also shown bills of sale aggregating $4,000 or $5,000 for the purchase of the furniture. After that, they went to a number of other places, breaking up at 3:00 or 4:00 a. m. on October 9th, with the understanding that Miss Pannos was to communicate with Leonard Monaco and then was to call Thomas Moretti. Later that day, a meeting was arranged for 8:00 p. m. at Moretti's mother's home. At that meeting both Lawrence and Thomas Moretti were present. Miss Pannos reported that she had not seen Monaco, and Thomas asked her to call him. She thereupon went to a neighbor's house, obtained Monaco's telephone number from his sister, and called him. Monaco asked her

71

to meet him at the home of his friend Maury Castillo. Pasquale Moretti, one of the defendants, drove her to Castillo's home. There she talked to Leonard Monaco. She then went back to Thomas Moretti's mother's home and told Thomas, in the presence of Lawrence and Pasquale, that Monaco would have nothing to do with the bribe. Thereupon Thomas said in the presence of Lawrence and Pasquale that he was being very nice about this, and that they would have to get rough about it. He said the first thing they would do would be to kill Maury Castillo, then Monaco's mother, then his father, and then Lenny. She was told to tell this to Monaco. After this, Thomas and Pasquale drove her home. The next day, October 10th, Miss Pannos went to Monaco's mother's home where she talked to his mother, then to Leonard Monaco, and then to Mr. Austin. That evening she went back to Moretti's mother's house. There she talked to Lawrence Moretti, who called Thomas. At Thomas's request she went out to his home. His brother-in-law drove her there. She told him she had not had a chance to see Leonard; that she had talked to Mrs. Monaco, and could not do anything more than convey the message to Leonard. This ended her visits with the Morettis.

Leonard Monaco testified that he was present at the shooting on August 24, 1951; that Salvi did not have a gun in his hand at the time of the shooting; and that while the coroner's inquest was being conducted and while he was in his lawyer's office the first or second day of the inquest in September 1951 he received a telephone call from Thomas Moretti. He identified Moretti's voice from having previously heard it the day after the shooting. Thomas Moretti offered him various sums of money, starting with $1,000 and going up to $5,000, if Monaco would say that he "was not sure if Salvi had a gun or not." He said he "did not

72

want me to lie but he just wanted me to say I was not sure if Salvi had a gun or not." Monaco then testified that he was sure that Salvi did not have a gun. He says he told Thomas Moretti that he would not change his story.

Much of the substantial portion of the testimony of the state's principal witness is admitted by Thomas Moretti. He testified that he undertook to find out all he could about Leonard Monaco. For that purpose he visited dives, brothels, saloons, and places where dope was sold; that he found out that Georgia Pannos was a friend of Monaco's and thought he might get information from her concerning Monaco; that he desired to get some evidence about burglaries by Monaco on which he had information. He explained his intensive cultivation of Miss Pannos' company on the night of October 8th–9th as an effort on his part to gain her confidence; that "After all, she was Monaco's girl friend and she would not betray him, not that fast anyway." He admits that he sought her out for this purpose; that it was he who suggested that they go to his mother's home; that they went to Emily Moretti's apartment; that Miss Pannos was there shown furniture and bills for the purchase of the furniture at wholesale prices, and that they were together until 3:00 or 4:00 o'clock in the morning, as testified to by Miss Pannos.

Following this, his memory becomes vague. He admits that he saw Miss Pannos again the following day at his mother's home, but does not know how she got there; that he had no appointment with her; that nothing was said about the matter which was uppermost in his mind; that he merely asked Pasquale to drive Miss Pannos home. His testimony with respect to the meeting on October 10th is also scanty—that Miss Pannos came to his home without any previous

arrangement; that he had not expected to see her again; that she arrived there sometime between 6:00 p. m. and midnight, which he later fixed as closer to midnight; that he was befuddled; that he did not know the purpose of her call; that he did not know how long she remained; and that he had forgotten the incident.

Pasquale Moretti denied that he did anything more than drive Miss Pannos home; that he did not know who she was, and that she was not identified to him in the introduction.

Lawrence Moretti testified that he saw Miss Pannos only twice, first, on the evening of October 8, 1951 when he came home about 8:30 p. m. and next, on the evening of October 12th when Miss Pannos, he said, came to his mother's home late in the evening and asked for Thomas. He denied knowing anything of the promises or threats.

██ Thus, a clear issue is made between the testimony offered on behalf of the State and that of the defendants. An examination of Miss Pannos' testimony reveals that she told a clear and consistent story, both on direct and cross-examination. This cannot be said of the testimony of Thomas Moretti, and the testimony of the other two defendants is no more than a direct denial. Even the cold record reveals why the jury believed the state's witnesses beyond a reasonable doubt, as against the testimony of defendants.

██ Some argument is made by defendants that accepting the testimony of Miss Pannos and Leonard Monaco, Thomas Moretti did not ask Monaco to testify to a lie; that all he wanted Monaco to say was that he did not know whether Salvi had a gun or not. A witness who can testify positively that a slain victim did not have a gun would be committing perjury if he were to testify that he did not know whether the victim had a gun.

■ It is argued that there is nothing to connect Lawrence Moretti and Pasquale Moretti with the charge. It was Pasquale who drove Miss Pannos from his mother's house to Maury Castillo's home, where she met Leonard Monaco. Miss Pannos testified that she reported her interview with Leonard Monaco to Thomas, Lawrence and Pasquale Moretti, and that it was at that interview that Thomas Moretti said that they had been very nice about the matter, but that now they would have to get rough. It was from that interview that Pasquale Moretti drove her home. As to Lawrence Moretti, he participated in the above events of October 8th and 9th and, according to Miss Pannos, he concurred in the offer made by Thomas Moretti on the evening of October 8th of $5,000 or a 4-room furnished apartment, and then he also went to Emily's apartment, where Emily showed Miss Pannos her furniture and also showed evidence of prices she had paid for the furniture. Defendants give no explanation that is at all credible of Emily's action in showing Miss Pannos the bills for the furniture.

■ It cannot be said too often that courts of review looking at the cold record are at a great disadvantage in arriving at any conclusion with respect to the facts of a case. The jury and the judge saw the witnesses and observed their behavior and demeanor on the witness stand. These imponderables they resolved in favor of the State, and their findings are based on evidence adequate to support findings of guilty beyond a reasonable doubt.

■■ No complaint is made with respect to the instructions or the conduct of the trial. The only question, therefore, is whether the technical questions raised by the defense have any support in the law. The first of these is that the indictment should have been quashed because the court was without jurisdiction to

enter the order appointing Harold A. Smith Special Attorney, because the petition therefor was not based on a cause within the statute. The statute provides that such appointment may be made whenever the state's attorney is sick or absent or unable to attend or is interested in any cause which it is his duty to prosecute or defend. The basis for the state's attorney's disqualifying himself was that he was a prospective witness and might be called to give evidence. Courts have so often condemned lawyers for appearing as witnesses in a cause which they represent, that it was clearly the duty of the prosecutor to disqualify himself when it appeared to him that there was a prospect of his being a witness. That is a sufficient interest within the meaning of the statute. In *People v. Doss,* 384 Ill. 400, 405, the state's attorney being a necessary witness in a criminal proceeding, a special state's attorney was appointed. The court there said that the appointment was regular and proper. Obviously, if the statute were so strictly construed as to make impossible the appointment of a special state's attorney in a case where the state's attorney was a prospective witness, injustice to the defendants and serious embarrassment to the State could result. The course pursued was correct, and common sense dictates that it must be supported. The further argument of counsel for defendants, that the averment of the petition states a conclusion, takes on the character of a special demurrer, and is without merit.

 It is argued that the petition of Harold A. Smith filed October 18, 1951, purports to rely on the order of September 18, 1951 for the authority of Smith to prosecute, and that it should have rested upon its own basis, as it refers to a new situation and crimes different from those mentioned in the petition filed September 18, 1951. The order of September 18, 1951

directed Mr. Smith "to prosecute said causes with the same power and authority in relation to such causes as the State's Attorney would have in the premises." It would be a rigidly legalistic approach for courts to refuse to recognize any connection between the order of September 18th and that of October 18th. Smith performed his duty by calling the court's attention to the offer of bribes and threats against Leonard Monaco, and asking the court's instructions. The court had knowledge of the previous petition and of the fact that the state's attorney had disqualified himself—a disqualification which applied to the second as well as to the first case, and the court had knowledge that he had previously ordered Smith to prosecute the causes with the same power and authority in relation to said causes as the state's attorney would have had. If courts are to completely enmesh legal proceedings in a maze of artificial technicalities having little or no relationship to the merits of a cause, it would be well to put a hobble on justice as well as a blindfold. There is no merit to the point.

 Complaint is made of the appointment of Richard B. Austin as Assistant Special Attorney. It is argued that Smith had no power to appoint Austin, and the case of *People v. Hanson,* 290 Ill. 370, is cited. That case holds that the office of assistant state's attorney in a county does not exist until the county board has determined that an assistant is necessary. In this county, where we can judicially note that many assistants are required by the state's attorney and that the county board has provided for them, there can be little question of the propriety of Austin's appointment. It is argued that Austin had no right to appear before the Grand Jury. *People v. Hartenbower,* 283 Ill. 591, 602, although cited by defendants, supports the theory of the State. There, one Lee O'Neill Browne appeared

before the Grand Jury and examined witnesses, acting in all respects as an assistant, although he had never been duly and regularly appointed. The court held that this did not affect the validity of the indictment. Austin did nothing more than Browne did.

██ The next point made by defendants is that it was error for the court to render judgments upon the verdicts returned by the court. This point relies on an oversight on the part of the court in failing to send forms of verdict to the jury. It appears that in the criminal court an instruction is given which sets forth the various forms of verdict that could be reached in a particular case and advises the jurors on their use. The verdicts are set forth literally in the instruction, with blanks for the filling in of names of defendants with respect to whom verdicts are rendered. In civil courts this procedure is usually handled by the court's orally advising the jury on the form of verdict. Apparently, however, because of rulings of the reviewing courts that any instruction must be in writing, the criminal court of Cook county has followed the practice used here. When the jury reached their verdicts, they looked around for forms on which to submit them. Not having any forms before them, they decided that it was the court's intention that they should use the forms contained in the instruction. These were six in number. They filled in three blanks which corresponded to their findings of guilty. The final form set forth in the instruction is as follows: ''We, the jury, find the defendant (naming him or her) not guilty.'' [sic]. They started to draw a line through this sentence, but perhaps feeling apprehensive about marring a court document or paper, they let it stand without naming any defendant. They then signed their names at the bottom of the instruction. About this time the court found that it had not submitted the forms of verdicts, and sent

them to the jury. Thereupon, the jury filled out three forms of verdict in precisely the same manner in which they had filled out the forms contained in the instruction. They then returned their verdicts to the court. Each form of verdict was read. After that the court polled the jury. Each juror responded that each verdict read was his verdict. Defendants' attorney then discovered the instruction which had been signed and brought back from the jury room, and seeing that the jury had signed it, asked the court to poll the jury on that. Thereupon, the court did poll the jury on the verdicts filled in on the instruction, all of which were exactly like the original three verdicts, and to each polling, the jurors answered that this was their verdict. Finally, the attorney for defendants asked the court to poll the jury on the last form in the instruction, which could not in any sense be called a verdict. The court started to poll the jury on this last so-called verdict, an entirely useless gesture. By that time some of the jurors were confused. What occurred is not entirely clear, but after calling the third or fourth juror, the court, realizing his mistake, discontinued the polling. Counsel refer to this signed instruction as a not guilty verdict. It is not such at all. The intention of the jury to find defendants guilty in accordance with the verdicts upon which the court rendered judgments is clear and unmistakable. That is and should be enough for any court. *People v. Bailey,* 391 Ill. 149.

Defendants received a fair trial and there is ample evidence to sustain the verdicts.

*Judgments affirmed.*

ROBSON, P. J. and TUOHY, J., concur.