.(No. 12043.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* OLIVER F. PAISLEY *et al.* Plaintiffs in Error.

*Opinion filed June 18, 1919.*

1. CRIMINAL LAW—*co-partners should be indicted as individuals.* In an indictment against co-partners in the banking business for unlawfully receiving deposits while insolvent it is proper to charge the defendants jointly as individuals, and a mere averment that they were partners does not amount to charging the offense against a partnership.

. 2. SAME—*indictment may join all parties alleged to be guilty of same offense.* It is proper to include in an indictment all parties who are alleged to be jointly guilty of the same offense, including those who are accessories before the fact.

3. SAME—*banking partners may be jointly guilty of receiving deposits while insolvent.* Although the statute describes the persons in the singular number who may be guilty of receiving deposits in the banking business while knowing themselves to be insolvent, the crime described is not such as only one person can commit but one which two or more persons, as partners or as individuals acting jointly, may commit.

4. SAME—*word "feloniously" in indictment may be surplusage.* An indictment charging a misdemeanor is not vitiated by the use of the word "feloniously," as that word may in such case be treated as surplusage.

5. SAME—*when bankers' books may be introduced against them.* Where bankers are being tried for receiving deposits while knowing themselves to be insolvent, books which they have delivered to their receiver in bankruptcy and from whom the State's attorney has secured them are admissible without further proof of their accuracy, and, whether the bankruptcy proceedings were voluntary or involuntary, the admission of such evidence does not compel the defendants to give evidence against themselves.

6. SAME—*papers seized from defendant are admissible if otherwise competent.* Papers and documents illegally seized from a defendant's possession are admissible in evidence against him in a criminal case if they are otherwise competent, and courts will not take notice of how they were obtained.

7. SAME—*the future income from possible improvements is not admissible to prove present value of property.* Testimony of the probable cost of improvements to be placed on lands or lots and the probable net rentals or income to be derived therefrom when

the improvements have been constructed is inadmissible to show the present value of such lands or lots, but such proof must be confined to the market value of the property for purposes to which it is adapted and for which it will command the best price.

8. SAME—*court is not required to write instructions.* The court is not required to write instructions but only to give those submitted when they are proper, and where an instruction as to the form of the verdict, in describing the punishments, reverses their statutory order, the defendants' counsel cannot complain, on review, that such instruction misled the jury in fixing the punishment, as counsel might have explained the statute by a proper instruction if he had seen fit to do so.

9. SAME—*other acts of embezzlement not connected with those charged are not admissible.* Upon the trial of parties charged with embezzlement it is not competent for the prosecution to prove that the defendants had committed other and distinct acts of embezzlement or other crimes in no way connected with the commission of the crime charged.

10. SAME—*witness cannot express opinion of solvency of bankers charged with receiving deposits while insolvent.* The opinion of a witness should form no part of the verdict of a jury, and in a prosecution of bankers charged with receiving deposits while insolvent an expert accountant cannot express his opinion that the defendants were insolvent, although he may have been thoroughly posted on the values of all the assets and other matters necessary to determine the question of solvency.

11. SAME—*in a prosecution of bankers the depositors cannot testify that their deposits were lost.* In a prosecution of bankers charged with receiving deposits while insolvent, testimony of depositors is admissible only to show debts owed by the defendants, but depositors should not be permitted to testify, in terms, that their deposits were lost, and where it is evident, after quite a number of such witnesses have so testified, that the purpose of such evidence is merely to prejudice the jury, objections made while the last of such witnesses is testifying are made in apt time.

12. SAME—*when an instruction as to considering value of surrendered stock should be given.* Where there is evidence tending to show that the defendant bankers had been compelled by threats to surrender, without consideration, shares of stock of value, the defendants are entitled to have the jury instructed that in determining whether defendants were insolvent they should take into consideration the value of the stock so surrendered as assets of the defendants.

CARTER, J., dissenting.

WRIT OF ERROR to the Appellate Court for the First District;—heard in that court on writ of error to the Criminal Court of Cook county; the Hon. GEORGE K. MARTIN, Judge, presiding.

MARSHALL SOLBERG, and HARRY L. SHAVER, (COLIN C. H. FYFFE, of counsel,) for plaintiffs in error.

EDWARD J. BRUNDAGE, Attorney General, MACLAY HOYNE, State's Attorney, and EDWARD C. FITCH, (EDWIN J. RABER, and EDWARD E. WILSON, of counsel,) for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Plaintiffs in error, Oliver F. Paisley and James T. Paisley, brothers, (hereinafter referred to as defendants,) impleaded with William H. Paisley, their father, were convicted in the criminal court of Cook county of unlawfully receiving a deposit of $700 from Mrs. Margaret Basch at the North Shore Savings Bank, in Chicago, on September 16, 1916, then knowing themselves to be insolvent. Defendants were sentenced May 21, 1917, to the penitentiary for a term of three years each and were each fined in the sum of $1400. William H. Paisley was sentenced to the penitentiary for one year but was not fined in any sum, and the jury by their verdict recommended clemency in his case. A writ of error was prosecuted to the Appellate Court for the First District, where the judgment was affirmed as to the defendants but was reversed and the cause remanded as to William H. Paisley. Defendants have sued out a writ of error to have the record reviewed by this court.

Defendants had been engaged in the real estate and banking business in Chicago since 1908, when they organized the Edgewater Bank. This bank was dissolved and its assets and liabilities were taken over by the Edgewater State Bank, organized by the Paisleys and others, April 11, 1914,

with a capital stock of $200,000 and $50,000 surplus. The capital stock was divided into 2000 shares, for which defendants and their father subscribed for 1350 shares. The Paisleys completely severed their connection with this State bank June 30, 1915. At this time they were also conducting, as partners, their private bank, known as the Summerdale Savings Bank, at 5302 North Clark street, organized in 1912. When convicted the three Paisleys were operating this private bank and two other private banks,—the North Shore Savings Bank, at 5545 Broadway, and the Grace Street Branch, at Broadway and Grace streets,—organized by them July 1, 1915, and August 1, 1916, respectively, and all three about a mile apart. These banks were not conducted as separate and distinct banks but as one entity. These banks had 1123 commercial and 2037 savings depositors when they finally voluntarily closed, September 19, 1916. Oliver F. Paisley managed the North Shore Savings Bank, James T. Paisley the Summerdale Savings Bank and Joseph B. Donahoe the Grace Street Branch. On September 20, 1916, Oliver F. Paisley filed a bill in the superior court of Cook county against his brother and father to dissolve the co-partnership and to liquidate and for the appointment of a receiver. A day or two later a petition in involuntary bankruptcy was filed in the United States district court for the northern district of Illinois, and the Chicago Title and Trust Company was appointed receiver in bankruptcy, took charge of the property and was later elected trustee in bankruptcy.

The indictment charges the defendants jointly as individuals and is not an indictment of their firm or co-partnership as an entity. There was an averment that they were doing a banking business, as partners, under three different firm or bank names, but the offense was not charged against any firm or bank as an entity. That is the usual and proper way in which to indict individuals who are co-partners. (*Meadowcroft* v. *People*, 163 Ill. 56.) It is always

proper to include all persons in an indictment who are jointly guilty of the same offense, including those who are accessories before the fact. The fact that the statute describes the persons in the singular number who may be guilty and be punished for this offense furnishes no sufficient ground for the contention that only one and not two or more persons can be properly indicted for the offense. Such a construction would be a strained and unnatural one of a statute clearly leveled against any and all persons who may, singly or jointly, violate it. The crime described is not such as only one person can commit, but one which two or more persons, as partners or as individuals acting jointly, may commit. (*State* v. *Smith,* 62 Minn. 540.) In the case cited a similar statute was so construed. Neither was the indictment vitiated by charging that the act was unlawfully and "feloniously" committed. The offense is only a misdemeanor, and by the use of the word "feloniously," as made in this indictment, a felony is not charged. The word "feloniously" may be regarded as surplusage. (Wharton's Crim. Pl. & Pr. sec. 261; I Bishop's New Crim. Proc. sec. 537; *State* v. *Slagle,* 82 N. C. 653; *Commonwealth* v. *Philpot,* 130 Mass. 59; *State* v. *Sparks,* 78 Ind. 166; *Staeger* v. *Commonwealth,* 103 Pa. 469; *State* v. *Crummey,* 17 Minn. 72.) Other courts of high standing hold otherwise, but the more numerous authorities are the other way and their reasoning more convincing.

The court properly permitted the books of all three of the defendants' banks to be used in evidence and without further proof of their accuracy or correctness. They were introduced as declarations against interest and were properly identified as defendants' books and their entries as entries made at their instance. Further proof of correctness was not necessary for such purpose. (*Loewenthal* v. *McCormick,* 101 Ill. 143.) These books were secured by the State's attorney's office from the receiver in bankruptcy, who had gotten them from defendants' receiver appointed

on their bill.  Consequently section 10 of article 2 of our constitution, providing "no person shall be compelled in any criminal case to give evidence against himself," was not violated.  (*People* v. *Hartenbower*, 283 Ill. 591.)  The rule is the same in this respect whether the bankruptcy proceedings are voluntary or involuntary.  Defendants were not compelled by the court to produce books or papers in their possession, and the cases of *Lamson* v. *Boyden*, 160 Ill. 613, and *Manning* v. *Mercantile Security Co.* 242 id. 584, are not in point.  Even papers and documents illegally seized from a defendant's possession are admissible in evidence against him in a criminal case if otherwise competent.  Courts will not take notice of how they were obtained.  (*Gindrat* v. *People*, 138 Ill. 103; *Trask* v. *People*, 151 id. 523.)  Other States having similar constitutional provisions have made similar holdings upon the question now before us.  (*State* v. *Strait*, 94 Minn. 384; *Commonwealth* v. *Ensign*, 228 Pa. 400.)  In affirming the judgment in the latter case the Supreme Court of the United States held that the fifth amendment to the Federal constitution, providing that no person "shall be compelled in any criminal case to be a witness against himself," was not violated by such admission of evidence, and that if it was, the said amendment was not obligatory upon the governments of the several States and regulates the procedure of the Federal courts, only.  *Ensign* v. *Pennsylvania*, 227 U. S. 592; *Johnson* v. *United States*, 228 id. 457.

The complaint that F. M. Zeiler, of F. M. Zeiler & Co., and W. M. Richards, of the Chicago Savings Bank and Trust Company, were permitted, over the objections of defendants, to introduce secondary evidence of the contents of certain book entries of their companies for the purpose of establishing the dates of certain loans to defendants, is not meritorious.  It was not disputed that the loans were in fact made, and there was no specific objection made that the evidence offered was secondary evidence.

Defendants sought to show the value of a certain leasehold, known as the 99-year school lease at Broadway and Clark streets, upon the supposition that a building to cost not less than $100,000 had been completed on the property in accordance with certain plans and a contract entered into with the school district nearly two years before the banks closed, the building having never been built or begun. Proof of probable cost, probable rentals and probable net income of the property was offered in this connection, and proof was also offered that certain of the floors or apartments had been contracted for and the rentals to be paid therefor agreed on in case the building should be completed. The court properly excluded this testimony as speculative in its nature and as evidence of the value of the property under conditions that did not exist and might never exist while property of the defendants. Testimony of the probable cost of improvements to be placed on lands or lots and the probable net rentals or income to be derived from such lands or lots when such improvements have been constructed is uniformly held inadmissible to show present value of such lands or lots. (*Burt* v. *Wigglesworth,* 117 Mass. 303; *Tallman* v. *Metropolitan Railway Co.* 121 N. Y. 119; *Hamilton* v. *Pittsburg, Bessemer and Lake Erie Railroad Co.* 190 Pa. St. 51; 13 Ency. of Evidence, 436.) They could only prove the market value of the leasehold for purposes to which adapted and which would command the best price.

The lower court, in its instructions to the jury, gave three like forms of verdict for each defendant, the last being for the verdict of not guilty. The other two forms were connected with the word "or," the first form as to Oliver F. Paisley being in this language: "We, the jury, find the defendant Oliver F. Paisley guilty in manner and form as charged in the indictment, and we fix his punishment at imprisonment in the penitentiary for a period of ...... years and a fine of ........ dollars." The second form of verdict was for a fine, only. Section 25*a* of the Criminal Code

provides that upon conviction the defendant shall be deemed guilty of embezzlement and shall be fined in double the amount of the sum so embezzled and fraudulently taken, and in addition thereto may be imprisoned in the penitentiary for not less than one year and not more than three, and the court so instructed the jury in its first instruction for the People. We agree with defendants' counsel that under the instructions as given the jury were not only likely to be, but were, confused as to which punishment was mandatory and which was in their discretion. This appears from their verdict against William H. Paisley and their recommendations as to him. This may have occurred by the court putting imprisonment as the first punishment to be inflicted, in the first form of verdict. It is equally clear, however, that defendants' counsel, by offering an instruction in their behalf making it clear that whether or not imprisonment should be fixed for each defendant was a matter of discretion with the jury after fully and fairly considering all the evidence in the case, might have altogether removed all confusion and doubt. The confusion brought about, as aforesaid, must be attributed largely to the action of counsel for defendants in not guarding the point of danger by instructions. The court is not required to write instructions but only to give those submitted to him, when proper. We would have been better satisfied with the instructions as to form of verdicts had the court named the first punishment as a fine and the second as both fine and imprisonment, as the statute so placed them. We are not, however, prepared to hold that it was error not to do so, as further instructions would have removed all erroneous impressions the jury may have received.

The Edgewater State Bank assumed all liability of the Edgewater Bank to depositors of the latter bank when the former took over the assets of the latter. The Paisleys in turn, and in consideration thereof, signed a guaranty to the Edgewater State Bank on April 11, 1914, by which they

guaranteed unconditionally and without reservation, the full
and prompt payment of the principal and interest to the
Edgewater State Bank as the same comes due or may be-
come due under extensions and renewals given, of all loans,
discounts, credits and overdrafts held by the Edgewater
Bank as an offset to its deposits and accepted by the Edge-
water State Bank, including all costs, attorneys' fees and
other outlays in enforcing the same and the guaranty. The
amount of their guaranty on their liability therein was not
to exceed in amount $198,398.44. The guaranty was to
be a continuing one and remain in full force and apply to
all loans, discounts, credits and overdrafts, and renewals
and extensions thereof, until they were fully paid. The
specific assets so guaranteed were not specifically set out
otherwise than as above set forth. The guaranty was suf-
ficient in form and sufficiently definite as to the assets guar-
anteed. The assets so guaranteed were all that was taken
over by the Edgewater State Bank from its predecessor, of
the description aforesaid, and the limit of liability on all
of them was the sum mentioned.

The total assets thus taken over by the Edgewater
State Bank, including notes of the Paisleys to the Edge-
water Bank, loans, discounts, overdrafts, bonds, deposit ac-
counts with other banks, and cash, were $345,164.06. This
amount was further increased by another item,—building,
vaults and grounds,—fixed at $50,000, and which it was
conceded is not covered by said guaranty. A State bank
examiner in December, 1914, informed the other officers
of the Edgewater State Bank that the defendants were
insolvent and that that bank ought not to continue longer
with the Paisleys as officers thereof. The result was that
the Paisleys resigned as officers of the bank December 12,
1914, and were only nominally connected with the bank
from thence up to June or July following, when all their
connection with it ceased. In May, June and October,
1914, the Paisleys had taken up $20,895.30 of the bad as-

sets so guaranteed, and on December 22, 1914, they took
up $21,303.48 more of the guaranteed assets, as shown by
the testimony of the cashier of the Edgewater State Bank.
About April, 1914, the Paisleys borrowed of various banks
in Chicago $120,000 or more, and put up as collateral se-
curity therefor certificates of stock of the Edgewater State
Bank owned by them.  This borrowed money, as appears
from the record, was paid in to the Edgewater State Bank
on their subscriptions for stock.  These loans in 1916 had
been reduced by the Paisleys to about $100,000 by pay-
ments.  On March 20, 1916, a State bank examiner required
an assessment of $120,000,—$60 per share of stock,—to
be levied and paid by the stockholders of said bank to make
good the bad assets still held by it.  The undisputed evi-
dence given by one of the State's witnesses, the former
cashier of the bank, is that of said sum of bad and depreci-
ated assets $50,000 was assets taken over by it from the
Broadway State Bank on July 23, 1915, referred to as
one of the Lorimer banks.  Another $15,000 thereof was
for depreciation on the item carried by it as building,
grounds, fixtures, etc.  It is also undisputed that the re-
mainder (about $55,000) of that assessment is all that is
chargeable to defendants under their guaranty.  The proof
also shows that $1088.79 of those bad assets of defendants
has been collected by the Edgewater State Bank since the
assessment was made.  So the entire claim under the guar-
anty of the Edgewater State Bank could not have exceeded,
under the proof in this record, the sum of $55,000 when
the banks of the defendants finally closed.

On April 21, 1916, representatives of the Edgewater
State Bank and of the various other banks from whom the
Paisleys borrowed money on their stock, met at the Con-
tinental and Commercial National Bank of Chicago and de-
liberated until after twelve o'clock that night.  The Pais-
leys were called in at the conclusion of the conference but
were not present during much of the deliberations of the

same. The result was, according to the testimony for the defendants, that the Paisleys, being unable to pay the assessment on their stock, were forced by threats of litigation and of throwing them into bankruptcy and closing their other banks to transfer and deliver up between 1100 and 1200 shares of their stock without receiving therefor any consideration,—not even so much as a credit upon any of their indebtedness to the members of said conference,—and to make new notes to said banks for the money they had borrowed, with agreements to pay thereon $500 monthly thereafter. Three of said banks surrendered their certificates of stock held as collateral (650 shares) to a syndicate of the Edgewater State Bank, refusing to pay the assessment. Four of those banks retained their certificates, paid the assessments and now claim to own the stock absolutely. The Edgewater State Bank sold the stock so transferred, to their other stockholders or others who would purchase the same, and now claim that the Paisleys own no interest therein or in the bank and are entitled to no credit by reason of said stock. One of the interested witnesses styles this deal as an unconditional sale of the Paisleys of all right, title and interest in the stock. There is no claim that the Paisleys received anything for such transfers. It was proved on the trial that the Edgewater State Bank requires $32,000 to get out whole on the Broadway State Bank deal, and that the book value of the Edgewater State Bank stock was on April 21, 1916, more than $105 per share and more than $104 per share when defendants' banks closed. Defendants held also about 30 other shares of stock of said bank when their banks closed, upon which the assessment had not been paid. A great part of the evidence for the State was devoted to defendants' connection with the State bank, and the greater part of their debts is shown to have grown out of their relation to said bank and as aforesaid.

Whatever may be said as to the transactions of the Paisleys, it is apparent that their stock surrendered was of

very considerable value, and that the demand on them for the surrender of this stock without even a credit given them as a consideration was a very unconscionable act upon the part of the banks who thus obtained it, whether by duress or otherwise. Not a witness in this case ever offered to swear that the value of that stock was ever less than par. The testimony of the State's witnesses even shows that its actual value at the time of the trial was equal to the par value. It was a question for the jury to determine what the truth was as to just how and in what manner this alleged sale was made.

Upon the foregoing evidence the defendants asked the court to instruct the jury, in substance, that no person has a legal right to compel another, by threats or by duress, to surrender his interests in his property, and that if they believed from the evidence that the defendants were induced to surrender their interests in the capital stock by reason of threats made to them that unless they did so the persons making such threats would take such action that the banks of defendants would be closed, then such surrender was without consideration and void; and in determining the question in this case whether or not the defendants were insolvent, they are entitled to have the jury take into consideration the value shown of their said stock at the time of surrender and as an asset or property of the defendants. It was therefore error in the court to refuse to give this instruction. There is no objection pointed out by the State to this instruction. It is practically conceded that defendants were entitled to credit for said stock in some sum, and counsel for the State say: "The defense offered no instruction controlling this evidence. The jury had the entire matter, and it is presumed that if defendants had any interest in such stock the jury would have taken it into consideration in determining whether or not they were solvent." These statements must be the result of an oversight. Two instructions were offered by defendants in substance

288 – 21

as above set forth. Both were refused and no instruction of similar import was given.

The court also committed serious error in permitting the State's attorney to prove four other distinct crimes against these defendants with the same minutia and detail as if the defendants were on trial for those offenses, the commission of which had no tendency to prove the offense charged in the indictment. The first three of these offenses were embezzlements, the first one being embezzlement of the proceeds of a collection for C. O. Anderson of a certificate of deposit for more than $2300 issued by a bank in Sweden. The second was the embezzlement of the proceeds of a note for $800, secured by a trust deed in favor of one Russell and who placed it in one of the defendants' banks for collection for him. This matter was entirely settled up with Russell in July, 1915, and was not even an indebtedness against the defendants when the banks closed. The third was the embezzlement of a certain note and mortgage for $2400, the property of the mother of Clarence H. Wright, placed in defendants' banks for sale and payment to her in the summer of 1915. Defendants did not sell the same but pledged the securities to secure a loan of O. F. Paisley at the Philip State Bank. The witnesses in this case and in the first case were permitted to state that they called for the money on their securities several times and that false statements were made to them in regard to the collection or sale of said securities, and that the defendants had not settled for the proceeds of the first collection, which had long since been collected, and had not made it known that the other securities were pledged, until after the banks were closed. The fourth offense was one of obtaining money by false pretense from the Western Union Telegraph Company by means of a false statement of the financial condition of the North Shore Savings Bank at the commencement of business June 10, 1916, and which statement said company had requested of that bank with a

view to carrying a deposit account with it. Every detail of this matter was gone into by the witnesses, including the further statement that in this account, obtained as aforesaid, there was $453.28 unpaid when the banks closed. The only part of this evidence that could under any circumstances have been material or admissible was simply the fact that when the banks closed the defendants owed those parties, or three of them, certain amounts of money that had not been paid and that said parties were not indebted to them. There was no pretense of using this evidence for that purpose, because they had already proved those matters by the books and by the evidence in connection with the books, and did not introduce over a sixtieth part of the more than three thousand depositors that had deposits in the banks when they closed. Upon trial of parties charged with embezzlement it is not competent for the prosecution to prove that defendants had committed other and distinct acts of embezzlement or other crimes in no way connected with the commission of the crime charged. *Kribs* v. *People*, 82 Ill. 425.

Frank M. Spohr, an expert accountant, in his examination, while expressly stating that he did not know the value of certain assets of defendants, testified, over the defendants' objections, that in his opinion the defendants were insolvent. Regardless of the question whether or not he was thoroughly posted upon the values of all the assets and other matters necessary to determine the question of solvency of the defendants, it is not permissible in such a case for a witness to express his opinion on the question of solvency, because that was one of the ultimate facts upon which the jury had to make their finding. No witness can thus invade the province of the jury, expert or otherwise. This court has so frequently ruled upon this question that it hardly seems necessary to refer to the decisions. The opinion of a witness should form no part of the verdict of a jury. (*Hoener* v. *Koch*, 84 Ill. 408; *Fellows-Kimbrough*

v. *Chicago City Railway Co.* 272 id. 71.)    Other States
have made the same holdings in offenses like the one now
before us.    *State* v. *Stevens,* 16 S. Dak. 309; *State* v. *My-
ers,* 54 Kan. 206; *Freeman* v. *State,* 108 Miss. 818.

Twenty-two witnesses,—twelve women, one newspaper
boy and nine men,—were called to testify that they had de-
posits in the defendants' banks when they closed, and that
they never had been paid their deposits and owed defend-
ants nothing.    Some of the women were working women,
and some of them testified to their children having small
deposits there for Christmas and for various purposes, all
detailed.    One of them told about her boy saving his money
to buy an American flag, and two others testified about
two children saving their money for their graduation day,
and that none of them got their money back.    Three of the
men were janitors and four others were men working at
various trades.    A number of these witnesses testified to
receiving letters from the defendants enclosing notes for
their deposits, with promises to pay in the future.    Some
of these witnesses testified, in answer to direct questions
and over the objections of the defendants, that they had
lost their deposits.    Whether the deposits were lost or not
was one of the ultimate facts to be found by the jury as
to the deposits in question, and it was not proper for any
witness to testify in express terms that his deposit was lost.
All of the foregoing evidence should have been excluded
after it became manifest that it was used or to be used
for no legitimate purpose except to unnecessarily prejudice
the jury.    Had the State in good faith desired to introduce
all the depositors, or any considerable number of them, for
the purpose of showing the amount of debts owed by the
defendants, to do so it would have been proper to prove
only that the defendants owed the depositors and that they
owed the defendants nothing, and the amount of such debts.
It is claimed by the State that the letters and notes of the
defendants were introduced in evidence for the purpose of

proving a partnership. The partnership was already proved by other evidence and was not denied, and the debts were proved by the books and the witnesses testifying concerning the same, and were not denied. Objections were not made to all of the testimony of these witnesses but only to a few of them towards the last, when the purpose of the examinations became manifest, and such objections were therefore made in apt time. Not over forty or fifty witnesses of the three thousand or more who had deposits in the defendants' banks were called to testify, and it is apparent that the testimony of the witnesses now under consideration could be of no aid in determining the whole amount of the deposits or in determining any issue in the case.

The defendants rightly complain of the misconduct of E. J. Raber, the attorney who examined and cross-examined witnesses for the State, in the examination of the witness Oscar Miller, an employee of the North Shore Savings Bank when defendants' banks closed. This witness testified positively, and he is not contradicted by any evidence in the record, that he was called for consultation a number of times before this trial, to the office of Raber, who at those times called him a three-year-old, a rummy and a fool, in language too vile to be here repeated. Raber also told him that when any witness did not want to come to his office they would simply send a policeman after him, and also told him the grand jury had threatened to indict him twice and that he saved him on both occasions. He apparently had this witness drilled as to how he should answer questions on the trial. More than twenty different times in his examination Miller was asked to state from what moneys the salaries of the Paisleys and other employees, and various checks drawn by the Paisleys on their banks, were paid, and he invariably answered, over the defendants' objections, that they were paid by the depositors' money or from moneys deposited by them. This testimony was clearly erroneous and unfair to defendants, but ob-

jections to it were promptly overruled in every instance. Those salaries and checks were paid, as a matter of fact, from the cash in the banks, which came from all sources, as any and all checks were paid. This witness refused to testify about the incidents relating to the C. O. Anderson collection on the bank in Sweden on the ground that it would incriminate him. In the discussion that arose on this question Raber said in the presence of the jury, "I will say further, that if this witness wants some incrimination done, as far as that is concerned we can give it to him."

It is as clear as any proposition can well be made that the defendants have not had a fair and impartial trial in this case, and that the judgment should be reversed and the cause remanded for the errors in the rulings of the court and for the misconduct of the State's attorney. It is repeatedly urged in the brief and argument of the State that the defendants' guilt is so clearly established that they are not entitled to a new trial, even if it be conceded that all the errors assigned are well founded. This assertion must come from a misconception of the law of this case, wherein the jury are judges not only of the question of guilt or innocence but of the amount and character of punishment that should be imposed. The defendants in this case have been given the greatest penalty in the way of imprisonment that is fixed by the statute, when it was entirely a discretionary matter with the jury as to whether or not imprisonment should be imposed as part of the penalty. No fair-minded man can say, it seems to us, that the errors in this record are not such as to demand a reversal of the judgment.

The judgments of the Appellate and criminal courts are reversed and the cause remanded to the criminal court.

*Reversed and remanded.*

Mr. JUSTICE CARTER, dissenting.