(No. 17740.—Reversed and remanded.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HARRY CLARK *et al.* Plaintiffs in Error.

*Opinion filed February 24, 1928.*

1. BANKS—*insolvency of bank cannot be proved by witnesses' opinions of value of securities.* In a prosecution of officers of a bank for receiving a deposit while the bank was insolvent the jury must determine from the facts, and circumstances in evidence whether the bank was insolvent on the day in question, and the opinions of witnesses concerning the condition of the bank and the values of notes and securities, without adducing the facts which support the opinions, are not admissible in evidence.

2. SAME—*burden is on the People to prove bank was insolvent when deposit was received.* In a prosecution of officers of a bank for embezzlement in receiving a deposit while the bank was insolvent the burden is on the prosecution to show that the bank was insolvent on the day in question, and to prove, also, that the defendants had knowledge of that fact.

3. SAME—*when a bank is insolvent within meaning of statute making officers guilty of embezzlement.* Under the provision of the Criminal Code making officers of a bank guilty of embezzlement in receiving a deposit during the insolvency of the bank, a bank is insolvent when the cash value of its assets realizable in a reasonable time, in case of liquidation by its proprietors as ordinarily prudent persons would generally close up their business, is not equal to its liabilities, exclusive of stock liabilities, as the term "insolvent" is not used in its special sense as applied to the ordinary relation of debtor and creditor.

4. SAME—*evidence tending to show cashier guilty of another embezzlement is not admissible in prosecution for receiving deposit during insolvency of bank.* In the prosecution of a bank cashier, with other officers, for receiving a deposit during the insolvency of the bank, evidence tending to show that the cashier had committed another and distinct act of embezzlement in no way connected with the commission of the crime charged is not admissible, especially where only a part of the transaction is shown and the cashier is not given an opportunity to explain the transaction.

5. SAME—*when instruction that jury must find that deposit was lost is properly refused in prosecution of bank officers for embezzlement.* In a prosecution of officers of a bank for embezzlement in receiving a deposit during the insolvency of the bank, an instruction to the effect that the prosecution must prove that the

particular deposit in question was lost to the depositor is properly refused, where it is so worded that the jury might understand that the entire deposit must be shown to have been lost, as the crime is complete if a portion, only, of the deposit is lost.

6. DEBTOR AND CREDITOR—*meaning of term "insolvency" as applied to relation of debtor and creditor.* As applied to the relation of debtor and creditor, the term "insolvency" denotes the insufficiency of the entire assets and property of a debtor to presently pay his debts, and as applied to a person, firm or corporation engaged in trade, insolvency is the inability to meet one's obligations as they fall due in the ordinary course of business.

WRIT OF ERROR to the Appellate Court for the Fourth District;—heard in that court on writ of error to the Circuit Court of Madison county; the Hon. J. F. GILLHAM, Judge, presiding.

TURNER, HOLDER & BULLINGTON, and H. J. BANDY, for plaintiffs in error.

OSCAR E. CARLSTROM, Attorney General, JESSE R. BROWN, State's Attorney, MERRILL F. WEHMHOFF, and I. H. STREEPER, for the People.

Mr. JUSTICE DEYOUNG delivered the opinion of the court:

Harry Clark, Stowell Beach and Irwin Hatridge were indicted in the circuit court of Madison county for the violation of section 1 of the act entitled "An act for the protection of bank depositors." (Cahill's Stat. 1927, p. 871; Smith's Stat. 1927, p. 928.) The indictment charged, in substance, that on October 31, 1922, Beach, Clark and Hatridge were chairman of the board of directors, president and cashier, respectively, of the First State and Savings Bank of Wood River; that the bank was then insolvent and the officers named had knowledge of its insolvency; that on the same day they accepted a deposit of $294 in money from George Smith, who was not then indebted to

the bank; that by reason of the bank's insolvency the deposit was lost to Smith and that Beach, Clark and Hatridge were guilty of embezzlement. Upon a jury trial Beach was acquitted but Clark and Hatridge were found guilty, and the punishment of each was fixed at a fine of $142.88 and imprisonment in the penitentiary for two years. Motions for a new trial and in arrest of judgment were made and denied, and by the court's judgment Clark and Hatridge were each fined in accordance with the jury's verdicts and sentenced to the Southern Illinois penitentiary, "there to remain until discharged according to law." They prosecuted a writ of error from the Appellate Court for the Fourth District and that court affirmed the judgment. By this writ of error a further review is obtained.

The First State and Savings Bank of Wood River was organized under the State Banking act in the year 1909 with a capital of $25,000, which was later increased to $100,000. Its business was conducted at Wood River, in Madison county. In October, 1922, Stowell Beach and Harry Clark were two of the bank's directors. Beach was chairman of the board, Clark was president and Irwin Hatridge was cashier. On the 25th of that month E. E. Nicholson, representing the Auditor of Public Accounts, made an examination of the bank's books, which disclosed its condition as follows:

RESOURCES

| | |
|---|---:|
| Loans and discounts | $658,116.33 |
| Overdrafts | 10,365.57 |
| United States investments | 200.00 |
| Other bonds and stocks | 104,854.00 |
| Banking house | 81,377.40 |
| Furniture and fixtures | 41,319.64 |
| Other real estate | 9,678.44 |
| Due from banks | 983.33 |
| Cash on hand | 29,196.73 |
| Exchanges, checks and collections | 10,728.60 |
| Error in other resources accounts | 374.52 |
| Total | $947,194.36 |

LIABILITIES

| | |
|---|---|
| Capital stock | $100,000.00 |
| Surplus | 75,000.00 |
| Undivided profits | 2,469.42 |
| Time deposits | 385,226.81 |
| Demand deposits | 264,983.42 |
| Due to banks | 18,106.07 |
| Dividends unpaid | 100.00 |
| Bills payable (borrowed from a correspondent bank) | 100,000.00 |
| Cash over | 1,308.64 |
| Total | $947,194.36 |

In September, 1922, the Auditor of Public Accounts requested a verified report of the bank's condition. Such a report, denominated a "call report," is usually asked before an examination of a bank is made. The report, verified by Clark, was submitted as of the close of business on September 26, 1922, and showed that the bank's cash reserve was $30,000 in excess of the reserve shown by its books. This discrepancy was explained by the fact that the bank had issued and sent to the State Treasurer three certificates of deposit for $10,000 each but that the money had not been remitted by the State Treasurer. When a bank borrows money from or seeks a deposit by the State Treasurer, the bank is usually required to forward its note or certificate of deposit, with collateral security, to the Treasurer for his inspection and approval before the money is remitted. The transaction represented by the three certificates was not disclosed by the bank's books but it was included in the report as an available cash item and the certificates as a liability.

From the examination made on October 25, 1922, it appeared that the deposits aggregated $650,210.23 while the cash reserve and money due from banks amounted to $30,180.06. The item of $18,106.07, shown as due to banks, was an overdraft of its account with its correspondent, the National City Bank, in St. Louis. Items, including school warrants and other resources, shown by the bank's books had been added to the cash reserve instead of the

loans and discounts or the bond account. Since the prior examination of the bank's condition, about six months before, the loans made by it had increased $145,140, while the deposits during the same period had grown slightly in excess of $91,400.

On the 25th or 26th of October the examiner, Nicholson, called a meeting of the directors of the bank. He directed their attention to the over-due notes, which at the time, including all classes of loans, aggregated $101,186.84. He dwelt upon the condition of the cash reserve, which was lower than that required by the regulations of the Auditor's office, and he spoke of the danger of carrying on the bank's business with such a small amount of money. He referred to the discrepancy between the call report and the books of the bank. The examiner and the directors reviewed one hundred and five past-due notes, twenty-one overdrafts and seventy-two of the larger loans. Eight loans were found, aggregating over $38,000, which had been made to directors and to firms or corporations in which directors, officers or employees of the bank were interested. The unsecured loans amounted to $300,529.21. Notes aggregating about $1600, the directors admitted, were bad. They agreed to reduce the loans and to increase the bank's cash resources. Later a meeting was held in the office of the Alton Bank and Trust Company in the city of Alton. Examiner Nicholson and two other representatives of the Auditor's office, directors Beach and Clark, and certain officers of local banks, were present. The purpose of the meeting was to borrow money from the banks in Alton upon the assets of the Wood River bank in order to increase its cash reserve. The dangerous element in the situation was deemed to be the bank's slender cash resources, for if heavy withdrawals of deposits should be made the bank would be compelled to close. The loan sought was not consummated. Another meeting was held in Alton a day or two later, and it was then suggested that the directors raise

$50,000 and deposit it in the bank in lieu of notes to be assigned to them and that an additional $50,000 be borrowed by mortgaging the bank's real property. In accordance with this plan the directors, on or prior to November 6, 1922, deposited $51,000, of which sum Clark contributed $15,000 and Beach $7500. Clark and Beach made other deposits in the bank on or after October 31, 1922. On November 1 Clark and Hatridge resigned as president and cashier, respectively. While notes aggregating $51,000 were set aside for the directors, they were never delivered to them but were left in the bank. Collections were made upon some of these notes but no portion of the money collected was paid to the directors. The proposed mortgage upon the bank's building and other real estate was negotiated. On November 1, Joe Slivka, a resident of Shipman, Illinois, formerly employed by the bank, was placed in charge of it, with instructions to report directly to the Auditor of Public Accounts. A bank examiner also was present part of the time. The bank continued to conduct its regular business in this manner until November 17, when depositors in large numbers appeared to withdraw their money, as the result of which the bank was closed by the State Auditor's office and placed in the hands of a receiver. Upon the appointment of the receiver Slivka became his assistant and continued in that capacity during the time the bank was in the course of liquidation.

The prosecution contends that the officers of the bank had made excessive loans, had taken worthless notes and had invested in securities which proved to be worth less than their cost, and that in consequence the bank was insolvent when the deposit in question was made. Plaintiffs in error, on the contrary, insist that the losses charged to the bank were largely due to the failure to realize the full value of its assets during the receivership; that not only was much of the prosecution's evidence concerning the value of the notes and securities held by the bank incompetent,

but that the evidence as a whole fails to disclose the bank's insolvency either at the time the deposit was accepted or at any other time.

The prosecution's evidence tended to show that the bank had made loans in excess of the total justified by its deposits and that its low cash reserve was an element of danger in carrying on its business. The receiver, his assistants and attorneys estimated that there would be a loss of $50,000 upon the notes held by the bank and that other notes aggregating $40,000 were of doubtful value. These figures, however, were offered about a year after the date on which the deposit from George Smith was received. Much of the testimony offered by the State concerning the values of the notes held by the bank is of an uncertain character, amounting to no more than the conclusions of the witnesses. Some of these conclusions had no bases to support them. Portions of the testimony of Slivka, assistant to the receiver of the bank, are illustrative of this fact. With reference to claims for insurance premiums owing to the bank he stated: "Those accounts are both good and bad, but they aggregate quite a sum; it is possible to work out some money; I should think you could collect all but a thousand dollars of it." Concerning certain borrowers he testified: "Reid Montgomery $2400; he paid $400 and has since petitioned in bankruptcy; it is my understanding that it is possible for the estate to pay about forty per cent. E. V. Maybury $2672; I don't know the gentleman. W. H. Stoft $4400; not paid; I made inquiry with reference to it; it is not good; it is not worth very much; it is of very little value—five or ten per cent. C. J. Schmidt $2550; its value is ten per cent. Schmidt & Mead Auto Company $12,563; it is in bankruptcy; from inquiry and investigation it is worth ten per cent. Fred and H. C. Smith and wife $16,861; we haven't gotten very far with it; it is possible to realize $5000 on the collateral; the parties haven't very much in excess of that; I consider it worth $5000. T. P.

Eggmann and C. A. Harnet $31,919; that is all good except $10,000, which is very doubtful." Other instances occurred in which the answers of the prosecution's witnesses were mere opinions concerning the values of notes and securities without adducing the facts which supported their opinions. The question of the solvency of a bank may depend upon many facts and circumstances. (*Martin* v. *Hertz,* 224 Ill. 84.) It was the jury's province to determine the issue whether the bank was insolvent on the day in question on facts in evidence and not upon witnesses' opinions of conditions. (*People* v. *Paisley,* 288 Ill. 310.) Instances in which the conclusions of the witnesses, merely, were stated and to which objections were made and overruled were sufficiently numerous to show that they were prejudicial to the plaintiffs in error and must necessarily have had a material bearing upon the jury's verdict.

The statute upon which this prosecution is based (Cahill's Stat. 1927, p. 871; Smith's Stat. 1927, p. 928;) provides: "That if any banker or broker, or person or persons, doing a banking business, or any officer of any banking company, or incorporated bank doing business in this State, shall receive from any person or persons, firm, company or corporation, or from any agent thereof, not indebted to said banker, broker, banking company, or incorporated bank, any money, check, draft, bill of exchange, stocks, bonds, or other valuable thing which is transferable by delivery, when at the time of receiving such deposit, said banker, broker, banking company or incorporated bank is in his or its knowledge insolvent, whereby the deposit so made shall be lost to the depositor, said banker, broker, or officer, so receiving such deposit, shall be deemed guilty of embezzlement, and upon conviction thereof, shall be fined in a sum double the amount of the sum so embezzled and fraudulently taken, and in addition thereto, may be imprisoned in the State penitentiary, not less than one nor more than three years."

The burden was upon the prosecution to show that the First State and Savings Bank of Wood River was insolvent on October 31, 1922. Insolvency has been defined as a general inability to answer, in the course of business, the liabilities existing and capable of being enforced. It denotes the insufficiency of the entire assets and property of a debtor presently to pay his debts. As applied to a person, firm or corporation engaged in trade, insolvency is the inability to meet one's obligations as they fall due in the ordinary course of business. (*Cunningham* v. *Norton,* 125 U. S. 77; *Martin* v. *Hertz, supra; Best* v. *Fuller & Fuller Co.* 185 U. S. 43; *Atwater* v. *American Exchange Nat. Bank,* 152 id. 605.) None of these definitions, however, was given in a case in which the issue was the solvency or insolvency of a bank. *Cunningham* v. *Norton, supra,* was a suit in the nature of an action of trespass brought by an assignee for the benefit of creditors against a United States marshal who had seized certain assigned property. *Martin* v. *Hertz, supra,* was a suit upon a replevin bond. In *Best* v. *Fuller & Fuller Co. supra,* a bill was filed to set aside a transfer of and a chattel mortgage upon personal property; and in *Atwater* v. *American Exchange Nat. Bank, supra,* a creditor's bill was filed to wind up the affairs of a corporation, to appoint a receiver, to enforce the statutory liability of its stockholders, and to apply its assets toward the payment of its debts.

In *Ellis* v. *State,* 138 Wis. 513, 119 N. W. 1110, 20 L. R. A. (n. s.) 444, the Supreme Court of Wisconsin had occasion to consider the meaning of the word "insolvent" in an act similar to the one upon which the indictment in the case at bar is predicated. The trial judge had charged the jury that whether the bank was insolvent on the particular days material to the case turned on whether it had sufficient assets to meet its liabilities in the ordinary course of business. The Supreme Court said that under insolvent

and bankrupt laws, by the theory of which the debtor should suspend and take or submit to such measures for the protection of creditors as insured equality of treatment the trial court's view was correct; that the limited meaning of the word "insolvent" applied in the administration of such laws was not the common, popular or general meaning of the term, which suggested merely a substantial deficit of assets to meet liabilities; that the lending of all save a comparatively small portion of a bank's deposits was inherent in the conduct of the banking business and that this condition was recognized by law; that it would be unreasonable to punish criminally, under a statute of the character here invoked, persons engaged in the banking business whenever their competency to pay all depositors in the usual course of business is challenged, regardless of their competency to pay them all ultimately. The court held that the term "insolvent," as used in such a statute, does not mean insolvent in the limited sense of inability to pay indebtedness in the ordinary course of business, but that the term means insolvent in the broad general sense of a deficit of one's assets in realizable cash available within a reasonable time, treated as an ordinarily prudent person would generally conduct his business under the same or similar circumstances, to pay his liabilities; and that a bank is insolvent, within the meaning of such a statute, when the cash value of its assets realizable in a reasonable time, in case of liquidation by its proprietors, as ordinarily prudent persons would generally close up their business, is not equal to its liabilities, exclusive of stock liabilities. This definition of the word "insolvent," as employed in the connection stated, expresses the common, ordinary meaning of the word, and for that reason must be taken to have been intended by the General Assembly in the enactment of the statute upon which the instant indictment is based.

Liquidation of a bank in insolvency proceedings is inevitably attended with losses, which often fall upon the de-

329—8

positors. The assets of a going banking concern are regarded very differently from the same assets after the bank has been forced into liquidation. The change of situation depreciates the value of the bank's property to a marked degree. An example is afforded in this case. The banking house, furniture and fixtures at the time of the examination on October 25, 1922, were carried on the bank's books at $122,697.04. Nearly a year later the receiver realized $52,150 from the sale of this property, although it appears that prior to such sale he was offered $75,000 therefor. The loss thus sustained upon the bank's real property was $70,547.04. The State's evidence shows that the estimated loss upon the bank's personal assets, even considering the doubtful notes as valueless, would be $90,000. The sum of these two items, $160,547.04, is $16,922.38 less than the combined capital, surplus and profits, which on October 25, 1922, amounted to $177,469.42. These figures do not take into account the deposit of $51,000 made by the directors to take the place of notes aggregating that amount. It does not appear, therefore, that it has been established beyond a reasonable doubt that the bank was insolvent when the deposit in question was accepted.

Only in rare instances has there been a prosecution of this kind unless the bank was so hopelessly insolvent that its condition in that regard satisfied every meaning of the term "insolvency" beyond question. The defendant in error relies upon *People* v. *Hartenbower,* 283 Ill. 591, and *People* v. *Dubia,* 289 id. 276. In *People* v. *Hartenbower, supra,* the banker, who was charged with embezzlement, confessed to three persons at the time the deposit was received that he was insolvent, and immediately thereafter arranged to go into bankruptcy. Likewise, in *People* v. *Dubia, supra,* it was proved that the defendant was insolvent when he received the deposit; that he had been insolvent for a considerable period; that he closed his bank within a few

hours after receiving the deposit and that on the next day creditors filed a petition in bankruptcy. In each of these cases the fact of insolvency on the date the deposit was received was clearly and indisputably established.

It was necessary for the prosecution to prove not only that the bank was insolvent on October 31, 1922, but that plaintiffs in error had knowledge of that fact. (*People* v. *Belt,* 271 Ill. 342.) The bank was conducted under the direction and supervision of the banking department of the State Auditor's office from November 1 until November 17, 1922. After the examination of October 25 efforts were made by the directors of the bank, at the examiner's request, to add to its cash resources. They deposited $51,000 in the bank. Of this sum plaintiff in error Clark raised $15,000 and Beach $7500. They made other deposits in the bank after October 31, 1922. It was only when depositors appeared in large numbers on November 17 to withdraw their money that the Auditor's office closed the bank. Payments to depositors were suspended, not because the bank was insolvent but because there was a lack of ready money to pay the extraordinary demands made upon it. In their testimony both Clark and Beach denied that the bank was insolvent when the deposit in question was made, and their acts comport with a belief in the bank's solvency rather than with a knowledge of its insolvency.

Over objection, testimony was offered by the prosecution and admitted that plaintiff in error Hatridge, before banking hours on November 6, 1922, presented to Cammie Holland, the assistant cashier, a check for $10,000 drawn by him on the Alton Bank and Trust Company to the order of the First State and Savings Bank. Hatridge requested Miss Holland to credit the check to the savings account of the latter bank. She took the check intending to comply with the request made but spoke to plaintiff in error Clark concerning it. Clark happened to be in the bank at the time, and he suggested that she call the bank at Alton over the

telephone, and upon doing so was informed that Hatridge's account had been closed. An offer was made on behalf of Hatridge to show that he had made an arrangement with C. A. Harnet, a business associate, to deposit $10,000 to Hatridge's credit in the Alton Bank and Trust Company on the day the check was drawn. An objection to this offer was sustained. Hatridge had resigned as cashier but he was indebted to the bank when he presented the check. His act, under the circumstances, might be evidence of an intention to discharge his obligation. If, on the other hand, he had taken money from the savings account and sought to make the shortage good, it was not competent for the prosecution to prove that he had committed another and distinct act of embezzlement in no way connected with the commission of the crime charged. (*People* v. *Paisley, supra; Farris* v. *People,* 129 Ill. 521; *Kribs* v. *People,* 82 id. 425.) Moreover, the portion of the transaction admitted would impress the jury that Hatridge was guilty of the additional offense of drawing a check upon a bank in which he had no money on deposit. No opportunity was given him for an explanation. If part of the transaction was given all of it should have been admitted. Hatridge was prejudiced by the admission of a portion and the rejection of the rest of the transaction.

Plaintiffs in error requested an instruction that one of the material averments in the indictment was that the deposit made by Smith was lost to him, and that unless the jury believed from the evidence, beyond a reasonable doubt, that "said deposit is lost to said Smith, then you should find the defendants not guilty." The instruction was refused. If it had been given the jury might have understood that the offense was not complete unless all of the deposit was lost. Loss of the whole deposit taken by a banker while insolvent is not necessary to complete the crime of embezzlement created by the act for the protection of bank depositors. The deprivation of some portion of the deposit is sufficient.

(*Meadowcroft* v. *People*, 163 Ill. 56.)   There was no error in the refusal of the instruction.

Other contentions are made by the plaintiffs in error for the reversal of the judgment. The matters of which complaint is so made are not likely to occur upon another trial. Hence it is unnecessary to consider them.

For the errors indicated the judgment is reversed and the cause is remanded to the circuit court.

*Reversed and remanded.*