## The People of the State of Illinois, Defendant in Error, v. Charles B. Munday, Plaintiff in Error.

### Gen. No. 6,604.

1. CRIMINAL LAW, § 460*—*when objection that grand jury was illegally drawn will not be considered on appeal.* On appeal from a judgment in a criminal prosecution, the objection that the grand jury returning the indictment was illegally drawn will not be considered where the abstract only shows a motion by defendant to quash the indictment, without showing whether any points were filed in support thereof, nor whether, if in writing, such objection was among them.

2. CRIMINAL LAW, § 502*—*when assumed on appeal that proof justified court's ruling on motion to quash indictment.* On appeal from a judgment in a criminal prosecution, where the bill of exceptions does not show what proof was heard on the motion to quash the indictment, it will be assumed that the proof justified the court's ruling.

3. CRIMINAL LAW, § 440*—*when matters not made part of common-law record.* Matters cannot be made a part of the common-law record in a case merely by the act of the clerk of the court in copying them into it.

4. CRIMINAL LAW, § 440*—*whether general order to draw grand jury constitutes part of common-law record, quaere.* As to whether a general order of the criminal court entered at a prior term directing the clerk to draw the names of grand jurors and issue a venire for them to appear on the next term constitutes a part of the common-law record on appeal from a judgment in criminal case tried at the latter term, quaere.

5. CRIMINAL LAW, § 440*—*when certificate of clerk as to drawing of grand jury is not part of common-law record.* A certificate of a clerk of the court in which an indictment was found that he drew fifty names of persons to appear as grand jurors and issued a venire does not, by being copied into the common-law record of a case, become a part thereof.

6. CRIMINAL LAW, § 445*—*necessity of preserving in bill of exceptions proof on motion to quash indictment for illegality of grand jury.* To be considered on appeal, the fact that the clerk of the court drew fifty names of persons to serve as grand jurors and issued a venire for them, should have been proven at the hearing of the mo-

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

tion made to quash the indictment on the ground that the grand jury was illegally drawn, and such proof should have been preserved in the bill of exceptions.

7. GRAND JURY, § 6*—*when general order to, and compliance therewith by, clerk do not render grand jury drawn illegal.* A general order of the criminal court to the clerk to draw from the grand jury box the names of fifty persons to serve as grand jurors and the compliance of the clerk therewith do not render the grand jury so drawn illegal.

8. INDICTMENT AND INFORMATION, § 41*—*when indictment in language of statute is sufficient.* An indictment drawn in the language of the statute is usually sufficient.

9. BANKS AND BANKING, § 64*—*when indictment for fraudulent banking not bad because of use of words "feloniously steal."* An indictment under Hurd's Rev. St. 1917, ch. 38, section 25a (J. & A. ¶ 3617) which, in the main, is in the language of the statute, is not bad because it uses the words "feloniously steal," but such words will be rejected as surplusage.

10. CRIMINAL LAW, § 136*—*when relevant evidence not excluded because of admissions.* On an indictment under Hurd's Rev. St. 1917, ch. 38, section 25a (J. & A. ¶ 3617) for embezzlement by a bank officer, the fact that, after the jury had been impaneled and sworn, defendant's counsel, in open court, admitted that on the date alleged the bank was insolvent and that defendant knew it, did not render it error for the court to permit the State to introduce proof upon the extent and length of time of the insolvency of the bank and upon defendant's knowledge of its condition and the time when he must have acquired that knowledge.

11. BANKS AND BANKING, § 64*—*when admission of evidence, on prosecution for fraudulent banking, as to insolvency of bank, not error.* On an indictment under Hurd's Rev. St. 1917, ch. 38, section 25a (J. & A. ¶ 3617) for embezzlement by a bank officer, evidence as to the extent and length of time of the bank's insolvency and as to defendant's knowledge of its condition and the time when he must have acquired such knowledge is not made incompetent because such evidence may have been relied upon in another prosecution against defendant for conspiracy to ruin the same bank and because it may also have some tendency to prove conspiracy.

12. CRIMINAL LAW, § 218a*—*what is proper cross-examination of defendant in prosecution for fraudulent banking.* Where, on an indictment under Hurd's Rev. St. 1917, ch. 38, sec. 25a (J. & A. ¶ 3617),

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number,

for embezzlement by a bank officer, where defendant has testified in chief tending to exonerate himself from any responsibility for the conduct of the bank on the day named in the indictment and for its receiving deposits on that day, including the deposit on which the indictment is based, it is proper cross-examination to question defendant with regard to what he actually did on that day concerning the bank's business and also as to what he testified at his trial, in a prosecution against him for conspiracy to ruin the same bank, concerning his acts in and about the bank the same day.

13. CRIMINAL LAW, § 218a*—*when refusal to permit defendant, in prosecution for fraudulent banking, to cross-examine witnesses as to certain checks, not error.* On an indictment under Hurd's Rev. St. 1917, ch. 38, sec. 25a (J. & A. ¶ 3617), for embezzlement by a bank officer, it is not error to refuse to permit defendant to cross-examine a witness as to checks drawn by him on the bank but not presented to it and to which no reference was made on direct examination.

14. CRIMINAL LAW, § 218a*—*when refusal to permit defendant, in prosecution for fraudulent banking, to question witness as to how much he owed bank at certain times, not error.* On an indictment under Hurd's Rev. St. 1917, ch. 38, sec. 25a (J. & A. ¶ 3617), for embezzlement by a bank officer, it is not error to refuse to permit defendant to ask a witness, a depositor in the bank, how much he owed the bank at certain times, when, owing to the fact that he could not know what checks had been presented and not paid, he would have been unable to answer accurately.

15. BANKS AND BANKING, § 64*—*when exclusion of evidence, on prosecution for fraudulent banking, as to certain checks, not error.* On an indictment under Hurd's Rev. St. 1917, ch. 38, sec. 25a (J. & A. ¶ 3617), for embezzlement by a bank officer, it is not error to exclude evidence as to checks drawn on the bank by the depositor who is testifying, at the beginning of the day on which the bank examiner took possession of the bank, which did not open its doors for business.

16. BANKS AND BANKING, § 64*—*when evidence, on prosecution for fraudulent banking, sufficient to warrant finding that entire deposit was lost.* On an indictment under Hurd's Rev. St. 1917, ch. 38, sec. 25a (J. & A. ¶ 3617), for embezzlement by a bank officer, defendant's contention that the evidence showed that none or only a small part of the deposit on the reception of which the indictment was based was lost, considered and *held* that the evidence was sufficient to warrant a finding that such deposit was not charged against an overdraft of the depositor, but that the entire deposit was lost.

17. CUSTOMS AND USAGES, § 20*—*when custom of clearing house is valid without consent of drawers of checks.* A custom established

by a clearing house for a conditional payment of checks by the drawee bank with the right to return them to the presenting bank within a limited time if there are not sufficient funds to meet them or they are otherwise invalid, is valid, without the consent of the drawers.

18. BANKS AND BANKING, § 64*—*when admission of incompetent evidence, on prosecution for fraudulent banking, not prejudicial.* On an indictment under Hurd's Rev. St. 1917, ch. 38, sec. 25a (J. & A. ¶ 3617), for embezzlement by a bank officer, where the evidence clearly establishes defendant's guilt, the fact that incompetent evidence of a conspiracy of defendant to ruin the bank may have been admitted as well as other incompetent or unnecessary evidence, is not prejudicial to defendant, where the evidence establishing defendant's guilt is of such character as to render it inconceivable that the jury would inflict only a fine and it had no power and made no attempt to fix the number of years for defendant's imprisonment.

19. BANKS AND BANKING, § 64*—*what determines liability of defendant in prosecution for fraudulent banking.* On an indictment under Hurd's Rev. St. 1917, ch. 38, sec. 25a (J. & A. ¶ 3617), for embezzlement by a bank officer, the liability of defendant does not depend upon the title of the office which he held in the bank nor upon his duties under its by-laws but upon the question of fact whether he assisted in keeping the bank open and doing business and receiving deposits on the day charged in the indictment.

20. BANKS AND BANKING, § 64*—*when evidence sufficient to show vice president one of officers responsible for receipt of deposits after insolvency.* On an indictment under Hurd's Rev. St. 1917, ch. 38, sec. 25a (J. & A. ¶ 3617), for embezzlement by a bank officer, evidence examined and *held* to warrant a finding that defendant, who was vice president of the bank, was one of the officers responsible for the receipt of deposits by the bank on the day charged in the indictment.

21. BANKS AND BANKING, § 64*—*when instruction, on prosecution for fraudulent banking, as to connivance, not objectionable.* On an indictment under Hurd's Rev. St. 1917, ch. 38, sec. 25a (J. & A. ¶ 3617), for embezzlement by a bank officer, an instruction, given for the prosecution, which states that if any officer of any incorporated bank "connives with" other officers of the bank to do a certain specified thing, he is deemed to have received the deposit on the reception of which the prosecution is based, is not objectionable on the ground that by using the term "connive" it implies that defendant's guilt may be based upon his passive consent, especially where the other instructions given would prevent the jury from being misled.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

22. WORDS AND PHRASES,—"*to connive with.*" The term "to con-
nive with" means "to co-operate secretly with," "to be in secret com-
plicity with another in a wrongful act," to take part or co-operate
privily with another," "to aid or abet," and the like.

23. BANKS AND BANKING, § 64*—*what not essential to crime of
fraudulent banking.* It is not essential to the guilt of a bank officer
under Hurd's Rev. St. 1917, ch. 38, sec. 25a (J. & A. ¶ 3617), that he
shall have received the deposit himself, but he is guilty if, knowing
the bank to be insolvent, he aids and assists in keeping it open and
receiving deposits, even though another actually receives the de-
posits.

24. CRIMINAL LAW, § 304*—*when not error to give instruction
bearing on credibility of witness who was codefendant.* On a pros-
ecution under Hurd's Rev. St. 1917, ch. 38, sec. 25a (J. & A. ¶ 3617),
for embezzlement by a bank officer, even though one of the other
defendants named in the indictment was a witness for the defense,
it is not error, as bearing on the value of the testimony of such wit-
ness, to instruct, at the request of the prosecution, that defendant
is the only person on trial and that it is wholly immaterial in the
case whether any other defendants named in the indictment have
been tried or whether any such other defendant has been convicted
or acquitted, especially where it does not appear from the evidence
that such witness had been tried, convicted or acquitted under such
indictment, though it did incidentally appear that he had stood a
trial of some kind with reference to the same bank.

25. WITNESSES, § 303*—*when conviction of crime legally affects
credibility.* It is only conviction of an infamous crime which legally
affects the credibility of a witness.

26. BANKS AND BANKING, § 64*—*when instruction in prosecution
for fraudulent banking, as to mode in which bank can accept check,
conforms to law.* An instruction that a bank can accept a check
only in writing conforms to the provisions of sections 184 and 131 of
the Negotiable Instruments Law of 1907 (J. & A. ¶¶ 7824, 7771).

27. BANKS AND BANKING, § 64*—*when defendant, in prosecution
for fraudulent banking, not harmed by instruction relating to mode
in which bank can accept check.* On a prosecution under Hurd's Rev.
St. 1917, ch. 38, sec. 25a (J. & A. ¶ 3617), for embezzlement by a
bank officer, the defendant is not harmed by an instruction that a
bank can accept a check only in writing, where there is no evidence
that the bank accepted any check orally.

28. BANKS AND BANKING, § 64*—*when refusal of instruction re-
lating to checks, requested by defendant in prosecution for fraud-
ulent banking, not error.* On a prosecution under Hurd's Rev. St.

*See Illinois Notes Digest. Vols. XI to XV, and Cumulative Quarterly, same
topic and section number.

The People v. Munday, 215 Ill. App. 356.

1917, ch. 38, sec. 25a (J. & A. ¶ 3617), for embezzlement by a bank officer, it is not error to refuse an instruction for defendant that every check drawn by a certain depositor on the bank was an assignment to the payee of so much of his funds in the bank, and that such fact was to be considered in determining the defendant's guilt or innocence, where such instruction is apparently presented to procure a finding that an overdraft equalling his deposit had been created by the issuance of checks by such depositor which had never been presented.

29. BANKS AND BANKING, § 64*—*when instruction, relating to conditional payment of check, proper in prosecution for fraudulent banking.* On an indictment under Hurd's Rev. St. 1917, ch. 38, sec. 25a (J. & A. ¶ 3617), for embezzlement by a bank officer, *held* proper, under the proofs, to instruct that if a bank pays a check conditionally, reserving the right to return it and charge it back to the person presenting it, if it finds it has not funds to meet the check, and does return it and charge it back for such reason, the loss does not fall upon the drawee bank and cannot be charged by it against the drawer.

30. BANKS AND BANKING, § 64*—*when refusal of instruction on purpose of evidence, requested by defendant in prosecution for fraudulent banking, not error.* On an indictment under Hurd's Rev. St. 1917, ch. 38, sec. 25a (J. & A. ¶ 3617), for embezzlement by a banker, it is not error to refuse an instruction requested by defendant that certain evidence is only admissible because it tends to support the charge of insolvency of the bank and knowledge by defendant, and in making up their verdict the jury will consider that evidence on those two questions, where such evidence also has a bearing on the degree of punishment to be inflicted.

31. CRIMINAL LAW, § 570*—*when refusal of instructions is not reversible error.* Reversible error cannot be based upon the refusal to give instructions where the principles of law contained in them are embodied in other instructions given at the party's request.

32. CRIMINAL LAW, § 617*—*when Parole Act applies as to manner of imposing sentence.* The Parole Act in force July 1, 1917 [Call. 1920 Stat. ¶ 4171(1) *et seq.*] applies as to the manner of imposing sentence where the trial was after that date, even though the crime was committed before it.

Error to the Circuit Court of Grundy county; the Hon. MAZZINI SLUSSER, Judge, presiding. Heard in this court at the April term, 1919. Affirmed. Opinion filed October 14, 1919.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

JOHN E. HOGAN, EDWARD H. MORRIS, W. D. BARTH-
OLOMEW and W. E. VINER, for plaintiff in error.

MACLAY HOYNE, FRANK H. HAYES, EDWIN J. RABER
and EDWARD E. WILSON, for defendant in error.

MR. JUSTICE DIBELL delivered the opinion of the
court.

William Lorimer, Sr., Charles B. Munday, Charles
G. Fox and Thomas McDonald were indicted by a
grand jury in the Criminal Court of Cook county on
the charge that, as officers of the LaSalle Street
Trust & Savings Bank (hereinafter called the bank),
they received a deposit of $275 from David H. Hoops
on June 11, 1914, when said bank was insolvent and
when said defendants well knew of said insolvency,
and thereby said deposit was lost to Hoops. Munday
took a change of venue to the Circuit Court of Grundy
county. A motion to quash the indictment was denied.
Munday pleaded not guilty and was tried and found
guilty, and his punishment was fixed at imprisonment
in the penitentiary and a fine of $550. Motions for a
new trial and in arrest of judgment were denied and
there was a judgment upon the verdict. Munday pros-
ecutes this writ of error to review said proceedings.
Lorimer and Munday and others were indicted by
the same grand jury for conspiracy to ruin this same
bank. Munday had a like change of venue to the Cir-
cuit Court of Grundy county, and was there tried.
The judgment in that case was reviewed in *People v.
Munday*, 204 Ill. App. 24, and 280 Ill. 32. The opin-
ions there published give a history of the origin, con-
duct and failure of the bank which need not be re-
peated here.

1. On the day set for the trial of the cause defend-
ant appeared in person and by counsel and moved to
dismiss the suit on the ground that the record and
files did not show any jurisdiction. This motion was

submitted without argument, and was denied. The bill of exceptions does not show whether any proofs were offered upon that motion, unless the statement at the close of the evidence that this is all the evidence offered upon the trial can be understood to apply to motions heard before the trial began. In the latter case it means that no evidence was offered upon the hearing of the motion. If that statement does not apply to motions heard before the trial began, then the bill of exceptions is silent as to whether evidence was heard on said motion or not. Defendant then entered a written motion to strike from the files the transcript of the record of the Criminal Court of Cook county. The attorney for the People read some portions of said transcript. The bill of exceptions does not show whether any proofs were offered upon that motion. Defendant's counsel submitted the motion without argument, and it was denied. The transcript does not show a bail bond given by defendant for his appearance at the Circuit Court of Grundy county, but he was there in open court, and for aught that here appears he may have been produced in the custody of the proper officer of the law. No reason appears why these motions were not properly denied. Counsel for defendant then renewed a motion previously made in Cook county to quash the indictment, and declined to argue it, and it was denied. Two grounds for said motion are here asserted. The first is that the grand jury which found this indictment was illegally drawn. There are several answers to this contention. The abstract only shows a motion by defendant to quash the indictment, and that that motion was overruled, and that defendant excepted. Whether any points were filed in support of that motion does not appear, nor whether, if in writing, the supposed illegal drawing of the grand jury was one of them, does not appear in the abstract. For aught that appears in the abstract the points may have been

in writing, and the point that the grand jury was illegally drawn may have been omitted therefrom, and, if so, it was waived. For want of a sufficient abstract on this subject, no such question is presented for review. Again, the bill of exceptions does not show what proof was heard by the court on this motion, and in the absence of any statement whether any or what proof was heard by the court on that motion we must assume in support of the ruling of the court that the proof justified its action. But defendant contends that the common-law record shows that the grand jury was illegally drawn. This indictment was presented by the grand jury on October 22, 1914. The clerk has inserted in the record kept by him a general order of the Criminal Court of Cook county on September 11, 1914, at a prior term, directing the clerk to draw from the grand jury box fifty names of persons to appear as grand jurors and to issue a venire for said persons to appear on the second Monday of the next term to constitute a grand jury. We doubt very much whether this general order at a prior term is any part of the common-law record of this case. If not, it could not be made so by the mere act of the clerk in copying it into this record, but should have been offered in evidence and embodied in the bill of exceptions in order to preserve it for our consideration. The next matter copied into the record by the clerk and necessary to enable defendant to question the drawing of this grand jury is a statement by the clerk that he did repair to said jury box and draw therefrom fifty names and issue a venire for said persons. We are of the opinion that said certificate did not become a part of the common-law record by the mere fact that the clerk of the court copied it into this record. The statute does require the clerk to certify to the sheriff the names drawn, that they may be summoned according to law. That writ issued to the sheriff is not in this record. If the clerk did draw

fifty names from the box and did issue a venire for them, those facts should have been proved at the hearing upon the motion to quash, and that proof should have been preserved in the bill of exceptions. The alleged facts so certified by the clerk are not preserved for our consideration. But if all the above properly appeared in the record, still it may be that the venire and return by the sheriff thereon (absent from this record) would show that the sheriff was able to find only twenty-three of the fifty persons named. It is argued that the sheriff selected at his pleasure twenty-three out of the fifty, but that is not necessarily so. These facts, if they existed, should have been proved on the hearing of the motion to quash and preserved in the bill of exceptions. The action of the court on this question is sustained either by assuming that no proof was offered, or that proof was heard and it did not sustain the contention of defendant. Clearly the record does not present this question for review. In any view of what the record really is, it does not show that the grand jury was illegal. We do not concede that the order to draw fifty names and compliance therewith made it illegal.

2. It is also said that the indictment is bad because it does not charge embezzlement, but uses the words "feloniously steal," and that its allegations are not aided by the charge that defendants "are deemed to have committed the crime of embezzlement." This indictment is in the main in the language of the statute, and an indictment so drawn is usually considered sufficiently technical and correct. It appears to be in the form approved in *Meadowcroft v. People,* 163 Ill. 56. In a like case under the same statute in *People v. Paisley,* 288 Ill. 310, it was held that the word "feloniously" should be treated as surplusage. The same rule should be applied to the use of the word "steal." The court did not err in overruling the motion to quash the indictment.

3. After the jury had been impaneled and sworn, counsel for Munday in open court admitted that on June 11, 1914, the bank was insolvent, and that Munday then knew it; and they then objected to the introduction by the State of evidence to show that the bank was insolvent, and that Munday knew it. The court overruled the objection, and it was understood that that objection should apply throughout the trial, without being repeated. We are not advised that this question has been discussed in any court of appeal in this State. But the ruling of the court below is sustained in other jurisdictions. In *Dunning v. Maine Cent. R. Co.*, 91 Me. 87, 39 Atl. 353, that court said: "It does not lie in the power of one party to prevent the introduction of relevant evidence by admitting in general terms the fact which such evidence tends to prove, if the presiding justice, in his discretion, deems it proper to receive it. Parties, as a general rule, are entitled to prove the essential facts, —to present to the jury a picture of the events relied upon. To substitute for such a picture a naked admission might have the effect to rob the evidence of much of its fair and legitimate weight. No exception lies to the admission of relevant evidence under such circumstances." This rule has been applied to a greater or less extent in *Commonwealth v. McCarthy*, 119 Mass. 354; *Commonwealth v. Costello*, 120 Mass. 358; *People v. Thompson*, 103 Mich. 80, 61 N. W. 345; *Trogdon v. State*, 133 Ind. 4, 32 N. E. 725; *State v. Jones*, 89 Iowa 182, 56 N. W. 427; and *People v. Fredericks*, 106 Cal. 554, 39 Pac. 944. In some of these cases it is said it is not error to either receive or reject testimony of what had previously been admitted by the opposite party. We are not cited to any case which holds it is error to admit such testimony. But further, the jury were to decide whether the punishment should be a fine only or fine and imprisonment. This means that in the opinion of the lawmakers

there may be different degrees of turpitude among persons guilty of the offense charged. The State and the defendant each had the right to prove all the facts which would tend to aid the jury in deciding the extent of the punishment which it would inflict. Was the bank slightly insolvent and for a very short time before the deposit so that its insolvency may have been a surprise to the defendant, and his guilt in receiving a deposit after he knew that fact but slight, or was it extremely insolvent and the crash long impending, so that the responsible officers should have stopped receiving deposits long before the one upon which the indictment was based? The extent of the knowledge of the indicted officers would naturally have an influence upon the extent of the punishment which the jury would inflict. We hold that the court did not err in permitting proof by the State upon the extent and length of time of the insolvency of the bank, and upon the knowledge which Munday had of its condition, and the time when he must have acquired that knowledge. This was not made incompetent because some of this evidence may also have been relied upon in the former case against Munday for conspiracy, and because such evidence might also have some tendency to prove a conspiracy.

4. Complaint is made that the court permitted an improper cross-examination of Munday. He gave testimony in chief, tending to exonerate himself from any responsibility for the conduct of the bank on June 11, 1914, and for its receiving deposits on that day, including the Hoops' deposit. The cross-examination was directed to drawing out what he actually did on that day concerning the business of the bank, and also what he testified at his trial in the conspiracy case concerning his acts in and about the bank on that day. Such a cross-examination was germane to the direct examination. It is argued that the court improperly restricted the cross-examination of Hoops by Mun-

day's counsel. That cross-examination in part related to checks drawn upon the bank by Hoops which were not presented to the bank. We hereinafter hold, in discussing instructions, that the bank was not liable upon checks never presented to it, and therefore it was not error to refuse a cross-examination on such checks, not referred to on the direct examination. Such a cross-examination would have tended to confuse the jury. So, too, as to cross-questions asking Hoops how much he owed the bank at certain times. Obviously he could only know what sums he had deposited and what checks upon the bank he had issued. He could not know what checks had been presented and not paid. His indebtedness to the bank depended upon the latter proposition. A statement by him of the total sum deposited and of the total amount of the checks issued would not show what he owed the bank or what the bank owed him, but would only tend to mislead the jury. He testified that the checks which he had recently drawn were not paid by the bank, but were paid by him immediately after the bank closed. When the entire direct and cross-examinations of Hoops are read in the record, we think it apparent that defendant was not deprived of any right of cross-examination. These suggestions also include certain checks Hoops drew and issued on July 12, at the beginning of which day the bank examiner took possession of the bank, and it did not open its doors for business. Obviously, those checks had no bearing upon this case. The court did not admit all of Hoops' stub check book, offered by defendant, and properly refused that offer because it included stubs of checks issued by Hoops on July 12, after the bank ceased doing business, and also because those stubs were not all proved to be correct; but the court permitted Munday's counsel to offer the stubs separately and the court admitted all the stubs which they so offered. Defendant had all the proof on that subject

which he chose to offer. There was no error in those rulings.

5. It is contended that no part of the Hoops deposit on June 11, 1914, was lost to him, but that it all applied in part payment of an overdraft by him and therefore Munday is not guilty; or, if any of such deposit was lost, yet, because of an overdraft, but a small portion was lost, and therefore the fine inflicted was much greater than double the actual loss, and therefore the judgment must be reversed. On June 4, 1914, the bank paid a check for $120, and on June 5, another like check for $230, and on June 6, two checks for $22.34 and $120, each drawn by Hoops, a total of $492.34, none of which was charged against the account of Hoops by the bank. On the opening of the bank on June 11, the books of the bank showed that Hoops had a credit balance of $132.85, and the bank that day paid a check for $25, drawn by him, which reduced his credit balance to $107.85. If those four checks, paid on June 4, 5 and 6, should have been charged to Hoops' account, it would have been overdrawn $384.49, and his deposit of $275 on that day would have paid only a part of that overdraft. If those are all the facts upon that subject, then no part of the deposit of $275 by Hoops on June 11, 1914, was lost, and Munday is not guilty of this charge. If the last three of said checks should have been charged to the account of Hoops, the deposit of $275 on June 11 paid the overdraft and left only a credit balance of $10.51, and in that case Hoops only lost that sum, and the fine should have been $21.02, and the fine of $550 cannot stand. The bank had at one time been a member of the Chicago Clearing House, but had ceased to be a member, and its daily clearings were made through other banks which were members of the Clearing House. Those four checks were conditionally received by this bank from other such banks which cleared for it under the rule or custom here-

inafter stated. Checks so received were at once entered upon the journal. Clerks were then set at work examining the several accounts of the respective drawers of said checks to see if there were sufficient funds in said respective accounts to pay said checks, or if there was any other reason why they should not be paid. All checks for which sufficient funds were found were then charged to the accounts of the respective drawers some time during that day. Whenever it was found that there were not sufficient funds to pay a particular check, a line was drawn through the entry of that check on the journal and it was not posted to the drawer's account, but it was entered upon a book which counsel call the ''No fund book.'' Every such check the bank had the right to return to the bank from which it had received it at any time before 2:30 p. m. of that day, and to receive back the amount of such check from the bank to which it had conditionally paid it that morning. This was a plan devised by the Clearing House to avoid detaining the messenger of the bank which presented the checks while investigations which might take several hours were being made to determine the state of each account on which such checks were drawn. It was to save time, and the payment was conditional only until 2:30 p. m. of that day. When a check was erased from the journal and placed upon the ''no fund book,'' it was returned to the presenting bank before 2:30 p. m., and there were columns in the ''no fund book'' which stated the cause of the rejection and the number of the bank to which it was so returned. Many such checks were presented each day and paid conditionally. The entries in the ''no fund book'' for June 4, 5 and 6 were in evidence. Forty-one such checks were rejected and returned on June 4, thirty-one on June 5, and forty-one on June 6, and those entries included the four checks above described. Witnesses testified to the entry of these four checks on the journal, to

the fact that a line was drawn through each of those entries on that book, to the fact that those checks were not charged against Hoops in his account, that they were transferred to the "no fund" book, that entries thereon showed that they were returned to the banks which had presented them, and that the moneys such banks had conditionally received for them were refunded to this bank.  These witnesses did not testify from a recollection of these particular checks, which of course would have been impossible, but from the condition of the books of the bank and their acquaintance with the manner in which such business was done by the bank.  This evidence was not disputed or questioned except in one slight particular.  On the pages of the "no fund" book in evidence for June 4, 5 and 6, a check mark generally appeared between the name of the drawer and the amount of the check.  Spohr, one of the witnesses who testified that these four checks were paid back to the bank, testified that he knew it from the check marks on the "no fund" book.  In fact, the record in this court shows a check mark as to the first only of said four checks.  Counsel for defendant contend that the absence of the check marks from the last three of said checks must be treated as superior to the evidence of the witness, and the court must believe that those three checks were not repaid but remained as an overdraft.  The State alleges that the check marks were on the original book, and that in examining so large a bill of exceptions the State overlooked the omission, and that we must take the word of the witness that there were such check marks opposite said three checks.  Munday's counsel reply that we must take the bill of exceptions as true, and that if it is incorrect the State could have had it corrected in the court below.  The latter position is sound.  Yet it is true that the witness saw something on the "no fund" book which convinced him that these checks had been

repaid.    Again, the entries of the numbers of the
several banks which these checks were "returned to,"
in the column having those words at the top, include
the meaning that said checks were received back by
said several banks as well as that they were tendered
to them.    The ordinary course of business under said
custom would require repayment by the bank which
had received conditional payment that morning.    If
by any possibility the bank returned said checks with-
out receiving repayment, it no longer had the checks,
and Hoops did not owe this bank for them.    When
we further find from the evidence that these checks
were not charged to Hoops' account and were not in
the bank when the receiver took possession, and that
Hoops testified that he paid his outstanding checks
soon after the bank closed, we cannot fail to conclude
that the jury were warranted in finding there was
no overdraft by Hoops on June 11, and that the entire
deposit was lost.    Munday's counsel contend that
after the bank had paid these checks it could not law-
fully return them to the clearing bank without the
consent of Hoops.    We are of opinion that the custom
established by the clearing house for a conditional
payment with the right to return within the limited
time was valid, without the consent of the drawers
of the checks.

6.    Plaintiff in error contends that he was prej-
udiced by the introduction of incompetent evidence
of a conspiracy.    This is argued but slightly, and our
attention is not drawn to any ruling of the court on
that subject.    This was not covered by the general
objection already stated to the introduction of evi-
dence showing the insolvency of the bank and Mun-
day's knowledge thereof.    If the evidence competent
to prove insolvency and Munday's knowledge had any
tendency to prove a conspiracy, it would not on that
account be objectionable.    But if any such evidence,
not properly admissible, did gain admittance, we fail

to see how Munday was prejudiced thereby. His guilt we regard as clearly established. Commercial paper of Munday and of the concerns with which he was connected was put into the bank as security for moneys he and they drew out, or which this bank cashed, which paper was worth very much less than the sums so drawn out, so that the bank lost thereby much more than one million dollars. Paper of Lorimer and of the concerns with which he was connected went into the bank in like manner, with a resultant loss to the bank of over three-quarters of a million dollars. These and other like but smaller transactions with other directors of the bank extended over a long period of time before the failure, and made the bank insolvent in fact long before the failure. Munday knew all these facts, and participated in the transactions. As a man of ordinary business sense he must have known that the bank was insolvent long before the alarm of the depositors precipitated the run which made its insolvency known to the general public. The offense was of so serious a character that we cannot conceive that any reasonable jury would inflict only a limited fine as the punishment. There was much evidence introduced that we think was unnecessary, and if the jury had the power and duty to fix the number of years of Munday's confinement in the penitentiary, and the jury had fixed the maximum number or a high number of years imprisonment, it would be a serious question whether the jury might not have been prejudiced against him by the volume of evidence introduced. But the jury could not fix the number of years, as hereinafter held, and did not attempt to do so. Therefore, we are of the opinion that the jury were not improperly prejudiced against Munday by any unnecessary or incompetent testimony that was admitted.

7. Lorimer was president and Munday vice president of the bank. This deposit was received June 11,

1914. Lorimer and Munday each testified that they met in the directors' room of the bank at 8 or 8:30 a. m. of that day and that Munday insisted that the bank should be closed, and that Lorimer refused and said that he as president would not permit it to be closed. Lorimer also testified that he had been actively performing the duties of president all of June and the latter part of May. It is argued that this relieves Munday from responsibility for the receipt of deposits that day. It may be that under the by-laws Munday had no duty as vice president which he could perform when the president was performing his duties as president. We are of opinion that the responsibility does not depend upon the title of the office held by defendant nor upon the by-laws, but upon the question of fact whether Munday assisted in keeping the bank open and doing business and receiving deposits on that day. Lorimer and Munday were alone when this conversation is said to have occurred, and there could be no direct contradiction of it. There are many other matters in evidence, however, which bear upon Munday's responsibility for the conduct of the bank that day, and during the days in June and in the latter part of May when Lorimer claims he was active as president. Munday was a witness in the trial of the conspiracy case hereinabove referred to, and his acts in connection with the bank on June 11 were gone into and in his testimony then he made no statement of this conversation and no statement indicating that he was not fully in control of the bank on that day. That he had been the dominant and controlling factor in the bank during its entire history was abundantly proven in many ways. There are letters in evidence which he wrote in which he said what he would permit and what he would not permit concerning the affairs of the bank, in which he plainly indicated that he had the final determination of such matters. It was shown that he was the one who generally determined whether

loans should be made.   Harkins, a bank examiner, made several examinations of this bank, beginning in January, 1914.   At one of these examinations, Munday said to him: ''If you want any information about this bank, come to me, I am running this bank and I will give you all the information you want.   Don't you go to anybody else.''   Two or three days before the bank closed, the Marquette Insurance Company wanted security for its account, which was about $400,000.   McDonald, the cashier, testified that he picked out securities to the amount of about $370,000 and submitted them to Munday for his approval, and, upon his approval, set them apart for the insurance company, and charged them to its account.   At 4 p. m. on June 10, a meeting of the board of directors was held, at which a resolution was adopted, authorizing the cashier to borrow $50,000 upon certain securities. Munday was present and his presence was necessary to make a quorum to adopt the resolution.   Spohr, assistant cashier, was sent by Munday to Kankakee during the last week the bank did business to sell some securities in order to raise money for the bank. The last day the bank did business was Thursday.   On the preceding Sunday, Lorimer and Munday, and the cashier and assistant cashier, were present in the bank, and Munday gave his approval or disapproval of various loans then being examined, and directed that certain matters should be submitted to one of the larger banks.   Shortly before the bank closed, but probably on June 10, Munday applied to Norris to get some money for the bank, and gave Norris a draft on Philadelphia, and Norris got it cashed and took the cash to Munday.   There were several subordinate banks in Chicago which operated in connection with the LaSalle Street bank.   Of one of these Munday was president, and he dominated them all.   If it had been his opinion on the morning of June 11, 1914, that the LaSalle street bank was insolvent and he wished

it closed, he would naturally have telephoned them not to deposit that day in the LaSalle bank. If, on the other hand, he was actively engaged in trying to keep the LaSalle bank open, he would naturally have sought to have them make deposits in the LaSalle bank. Of these subordinate banks which Munday controlled, two made deposits in this bank on June 11, and another made four deposits on that date. The total of the deposits they so made was nearly $25,000. Devoney, connected with another bank which had a large sum on deposit in the LaSalle bank, testified that the assistant cashier of his bank called him about 10:30 a. m. of June 11, and told him that he could not get money from the LaSalle bank, and the witness then went to that bank, reaching there about 11:30 a. m. and applied to Munday for money for his bank, and that Munday said they were a little short but to wait around a little while and they might get some; that he waited until 2 p. m. and he had not received any, and that he again applied to Munday and Munday told him that the money was short but that he was expecting some, but that it had not yet come in, and he then asked Munday to give him back securities which he had in the bank and which he could use elsewhere, and that Munday then gave him 500 shares of Devoney's bank stock at about 2:30 p. m. and Devoney testified that he had been in the bank waiting for them from 11:30 a. m. until 2:30 p. m. and that Munday was around there in the bank during that time, and that during that time he offered Munday assistance if it was needed, and Munday said he did not need any help and that he was expecting some money at 2:30 p. m. or 3 o'clock. Niblack, who became receiver of the bank, either personally or through his trust company, testified that Munday told him he was the largest shareholder in the bank and that he controlled it; that he was more interested in the bank than any one else; that he was the manager of the bank and knew more about it than anybody else; and that these

statements were repeated by Munday many times in different talks. A meeting of the board of directors was held at 2 p. m. of June 11, and a resolution was then adopted to sell a certain note and mortgage for $90,000, and Munday was present and his presence was necessary to make a quorum to adopt the resolution. Tholen, the cashier of the Illinois State Bank, was at the LaSalle bank on June 11 to get currency for a check for $16,000 drawn on the LaSalle bank, and the paying teller refused to give him the money, but told him to see Munday, and he did see Munday and asked Munday the reason why he could not have his money, and Munday answered: "You do not need that money to-day. By the time you get over there you will be ready to close up, and I will send it over to you the first thing tomorrow morning." It was proved by the witness, Hayden Bell, that at the trial of the conspiracy case, Munday testified that in his opinion the bank was solvent when it was closed by the bank examiner on the morning of June 12. From this evidence and from many other facts and circumstances in evidence, we conclude the jury were warranted in finding that Munday was actively engaged in managing the bank all day June 11, no matter what the conversation may have been between Lorimer and Munday early that morning. In our opinion the evidence warranted the jury in finding that Munday was one of the officers responsible for the receipt of deposits by the bank that day.

8. People's given instruction 2 began that, if any officer of any incorporated bank "connives." This was followed by various things which might be found from the evidence, and ended that Munday, under those circumstances, was deemed to have received the Hoops deposit. Counsel for plaintiff in error discuss this instruction as if it read "connives at keeping the bank open for the receipt of deposits," and argue that "to connive at" means only passive consent, and

that passive consent does not constitute guilt. The instruction reads "connives with" other officers of the bank. The word "with" makes the two words mean "to co-operate secretly with," "to be in secret complicity with another in a wrongful act," "to take part or co-operate privily with another," "to aid or abet," and the like. We hold that the use of the words "connive with" did not vitiate the instruction, which was in all other respects accurate. This instruction did not direct a verdict, and if there is any doubt whether the jury would understand it correctly, other instructions prevented an erroneous application of it. Defendant's given instruction 5 said that knowing a crime is being committed and doing nothing to prevent it is not a violation of law. Defendant's given instruction 18 said the jury should find Munday not guilty, unless the People showed beyond a reasonable doubt that he did some affirmative act authorizing the receipt of a deposit by the one who did receive it. Defendant's given instruction 21 told the jury that if Munday knew on June 11, 1914, that the bank was open for business, but did not aid, abet or assist in opening the bank, or keeping it open, then the jury should find him not guilty. Defendant's given instruction 25 said that if Munday did not aid, abet or assist in opening the bank or keeping it open on June 11, 1914, and if Hoops made a deposit of $275 on that day, and it was not received by Munday in person, the jury should find him not guilty. Defendant's given instruction 26 and other instructions given at defendant's request were to the like effect. But if the word "connive" meant only "consent," the use of the word "consent" in defendant's given instructions 22 and 35 is worthy of notice. We are satisfied the jury could not have been mislead by the use of the words "connive with" in People's instruction 2. People's given instruction 3 said that to authorize a conviction, it was not essential that Munday should

have personally received the deposit in question, or should have known that such deposit was made, but if the jury believed from the evidence beyond a reasonable doubt that Hoops deposited $275 in cash in the bank on June 11, 1914, and if the deposit was delivered to a duly authorized receiving teller of the bank, and if Munday as vice president of the bank actively participated in keeping the bank open for the receipt of deposits and, as a result thereof, said deposit was received, and if Munday knew deposits were being received, then the deposit was received by Munday as an officer of the bank. Counsel for Munday contend that in order to be guilty he must have received the deposit himself. This question seems never before to have been directly presented to a court of review of this State, although in most of the cases before the Supreme Court under this statute the circumstances were such that it was well-nigh impossible that the indicted officers or owners of the bank could have actually received the deposit or have seen the money taken in. The decisions of the courts of other States on this question are not in harmony, and their statutes on this subject sometimes differ from ours. The conclusion here contended for on behalf of Munday would destroy the safeguards which this act was designed to afford depositors in banks, or, at least, would furnish a ready means of evading liability under this act. Under the construction contended for, the man who controls a bank has but to incorporate it, so that its receiving teller is not his personal agent, and if he knows the bank is insolvent he can stay away from the immediate vicinity of the place where deposits are being made and can cause his insolvent bank to remain open and receive deposits without any risk of incurring the penalties which this act prescribes. We think the rule most consistent with the obvious purpose of the statute is to hold that the officer of the bank who, knowing it to be insolvent, aids

and assists in keeping it open and receiving deposits is as guilty of receiving each particular deposit so made as if he personally stood at the receiving window and counted and took in the deposits. It is also urged that this instruction assumes that the bank received deposits on that day and that Munday knew it. Both these facts were proved and not denied. The bank received over $150,000 of deposits on that day, and it is clear that Munday knew that the bank was running. We are of the opinion that the court did not err in giving People's instruction 3.

9. People's instruction 12 informed the jury that the only defendant on trial was Munday and that it was wholly immaterial in this case whether any other defendants named in the indictment had been tried or whether any such other defendant had been convicted or acquitted. This is strictly correct as a matter of law. But Lorimer was named as a defendant in the indictment and he was a witness for Munday, and it is argued that it is a matter of importance to defendant whether Lorimer has been tried and convicted or tried and acquitted, as it bears on the value of his testimony. We are of opinion that the jury would not be likely to understand that this instruction had any reference to the value of Lorimer's testimony. But further, our attention is not called to any evidence set out in the abstract, which shows that Lorimer had been tried under this indictment, or that he had been either convicted or acquitted thereunder. It does incidentally show that he had a trial of some kind relating to this bank, but not the result. Hence, we do not see that it could have harmed Munday. Again, it is only conviction of an infamous crime which legally affects the credibility of a witness. (*Bartholomew v. People*, 104 Ill. 601.) This record does not show that Lorimer has ever been indicted for an infamous crime.

10. Complaint is made of People's given instruction 5, because it says a bank can accept a check only

in writing. Our Negotiable Instrument Law, in force July 1, 1907, provides in section 184 (J. & A. ¶ 7824), that a check is a bill of exchange, drawn on a bank, payable on demand; and in section 131 (J. & A. ¶ 7771) that the acceptance of a bill of exchange must be in writing and signed by the drawee. This instruction conforms to that statute. Besides, our attention is not drawn to any proof that the bank orally accepted any check drawn by Hoops, and therefore Munday was not injured by the instruction.

11. Various instructions requested by the People and by defendant, respectively, were addressed to the claim of Munday's counsel that every check drawn by Hoops on the bank was an assignment to the payee of the check of so much of his funds in the bank and that that fact was to be considered in determining the guilt or innocence of Munday. Apparently, it was desired that the jury should find that outstanding checks issued by Hoops, though never presented to the bank, had created an overdraft, and that this deposit on June 11 applied upon that overdraft, and Hoops lost no part of the deposit. The court refused this proposition in every form presented, and the court instructed at the request of the People that outstanding checks drawn by Hoops but not paid by the bank were not material. Without discussing what the law on that subject may previously have been, under *Munn v. Burch*, 25 Ill. 35, and many later cases, we are of opinion that the rulings of the court on instructions on this question have been the law of this State under the facts of this case ever since the Negotiable Instrument Law went into force on July 1, 1907. Section 126 (J. & A. ¶ 7766) thereof is as follows: "A bill of itself does not operate as an assignment of the funds in the hands of the drawee available for the payment thereof, and the drawee is not liable on the bill unless and until he accepts the same." The court also instructed the jury that if the bank pays a check

conditionally, reserving the right to return the same to the person presenting it and to charge it back to the person presenting it if it found it had not funds to meet the check, and returns the check for that reason, and charges it back to the person or bank presenting the same, the loss does not fall upon the bank upon which it was drawn, and the check cannot be charged by the bank upon the drawer. This met the case made by the undisputed proof as to the four checks drawn by Hoops upon the bank, taken in conditionally by the bank on June 4, 5 and 6, 1914, and afterwards returned on the same day for want of funds to the bank presenting the same, pursuant to the rule or custom under which the banks in Chicago were acting in clearing checks. If the bank found it had no funds to pay any of said checks and returned the same in compliance with said rule, and either received the money or credit for said checks, it no longer had any claim against Hoops because of said checks. We approve this instruction as applied to the proof in this case.

12. Defendant's refused instruction 2 said that as to certain evidence introduced, it was only admissible because it tended to support the charge of insolvency of the bank and knowledge by the defendant, and in making up their verdict the jury would only consider that evidence on those two questions. As we have already suggested, this evidence also had a bearing on the degree of punishment to be inflicted, and the instruction was therefore properly refused. It is sufficient to say of other instructions, requested by defendant and refused, that so far as they state the law correctly, they are embodied in other instructions given at the request of defendant.

13. Complaint is made because the court did not require the jury to fix the length of the imprisonment, and because the jury did not fix it. It is argued that as this crime was committed before the present

Parole Act went into force on July 1, 1917, the jury were required to fix the term of imprisonment. It was held in *Featherstone v. People,* 194 Ill. 325, and *People v. Hartsig,* 249 Ill. 348, that the parole laws are not intended to fix the punishment for crime but to direct the manner of imposing the sentence by the court. *People v. Tananevicz,* 285 Ill. 376, is decisive of this question. We have examined the abstract and briefs and petition for a rehearing in that case. They show that the crime was committed in October, 1916; that the indictment was found in May, 1917; that a plea of not guilty was entered in June, 1917; that the jury were impaneled to try the case on July 2, 1917, after the present parole law went into force. The jury fixed the punishment at 3 years in the penitentiary. The court disregarded that time and sentenced the defendant to an indeterminate term of 1 to 3 years, as here. It was held the action of the jury in fixing the punishment was without authority and was surplusage, and the judgment was affirmed. This amounts to holding that, though the crime was committed before July 1, 1917, yet if the trial is after that date, the present Parole Act applies. This is not affected by *People v. Paisley,* 288 Ill. 310. We have examined the abstract and briefs in that case. They show that the crime was committed in September, 1916; that the indictment was returned in January, 1917; that the trial and verdict were in February, 1917, and the motion for a new trial was denied in April, 1917. Apparently the motion in arrest was heard and denied and judgment rendered on May 21, 1917, though the precise date of the judgment is not given in the abstract. The proceedings, therefore, were before the act of July 1, 1917, and what is there said does not apply to this case. The same construction of the parole laws is given in *People v. Moses,* 288 Ill. 281.

We find no reversible error in the record and the judgment is therefore affirmed.

ADDITIONAL OPINION OF REHEARING.

PER CURIAM.

Plaintiff in error filed a petition for a rehearing herein on November 11, 1919. Before that date the parties appeared in the Circuit Court of Grundy county in term time, and pursuant to an order of said court then made, the defendant in error filed there an additional transcript of the record of the Criminal Court of Cook county; and on the same day on which said petition for a rehearing was filed here, defendant in error presented an additional record from the Circuit Court of Grundy county containing said additional transcript from the Criminal Court of Cook county and asked leave to file it. It was afterwards filed here pursuant to leave. Plaintiff in error has made no reference to said additional record in his petition for a rehearing, nor has he filed any suggestions concerning the same.

It therefrom appears that said indictment was not found by the grand jury shown in the record discussed in our foregoing opinion, but by a special grand jury impaneled in July, 1914, to inquire whether crimes had been committed by the officers and agents of said bank, which grand jury was continued in force from term to term until the October term, 1914, and then returned said indictment. Said additional record shows some other new matters connected with the drawing of said grand jury, and shows that plaintiff in error gave bail in the Criminal Court of Cook county. Some things said in the foregoing opinion are not applicable to this additional record, but it furnishes no reason to change our conclusions. We have considered the petition for a rehearing, and adhere to our views heretofore expressed. The petition for a rehearing is therefore denied.